Larry J. Wulkan (021404)
Jennifer L. Allen (027941)
Michael Vincent  (029864)
Adrianna M. Chavez (035011)
**STINSON LLP**
  Firm Identification Number 00462400
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: larry.wulkan@stinson.com
        jennifer.allen@stinson.com
        michael.vincent@stinson.com
        adrianna.chavez@stinson.com
Attorneys for Plaintiff Lisa Yearick

J. Scott Halverson
**LAW OFFICES OF J. SCOTT HALVERSON PC**
1761 East McNair Drive, Suite 103
Tempe, Arizona 85283-5056
Tel: (480) 777-7776
Fax: (602) 375-7444
Email: scott@halversonfirm.com
Attorneys for Plaintiff Leigha Huber

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lisa Yearick, individually, as Personal Representative of the Estate of Edward Rudhman, and on behalf of Leigha Huber, statutory beneficiary,<br><br>              Plaintiffs,<br><br>v.<br><br>Maricopa County, a public entity; Sergeant Robert Leatham and Kristy Leatham, husband and wife; Sergeant Ryan Kelleher, an unmarried individual; and Deputy Philip Asiedu and Morcelia Asiedu, husband and wife,<br><br>              Defendants. | No. 2:20-cv-00545-SPL<br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' 12(B)(6) MOTION TO DISMISS MARICOPA COUNTY** |

When the Arizona Legislature waived sovereign immunity, it determined that counties would be responsible for the acts of their officials, including the torts of sheriffs and their deputies. Any other result ignores Arizona's statutes and creates the absurd situation in which the entity in charge of defending, managing and settling claims against the deputy has no

responsibility for the deputy's acts leaving plaintiffs with no recourse against the employers who the tortfeasor served when injuring someone else.[1]

## **Memorandum of Points and Authorities**

Maricopa County is vicariously liable for the acts of its deputy sheriffs. Deputy sheriffs are county "employees," and a county is thus the responsible public entity for those officers. Defendants cite a few statutes regarding the sheriff's statutory powers and then argue that because the county does not hire or terminate the sheriff's employees, and has no right of control over them, it cannot be vicariously liable for their acts. But when the Arizona Legislature established the statutory system for claims against public entities and officials, it determined, as a matter of public policy, that a county is vicariously liable for the acts of all of its employees. The right of control is not relevant; the official relationship between the employee and a county is the dispositive factor.

**I.**  **The Arizona Legislature has comprehensively defined the broad contours of governmental tort liability and explicitly recognizes a county's liability for the acts of its employees, including sheriffs and deputy sheriffs.**

In *Ryan v. State*, the Arizona Supreme Court held that "the state and its agents will be subject to the same tort law as private citizens." 656 P.2d 597, 600 (1982). The court also stated that governmental immunity should be "a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy." *Id.* Two years later, the Arizona Legislature passed the Actions Against Public Entities or Public Employees Act (the "Act"). 1984 Ariz. Sess. Laws, Ch. 285. The "comprehensive act" governs "the immunity and liability of public entities and employees." *Johnson v. Superior Court In & For County of Pima*, 763 P.2d 1382, 1383 (Ariz. App. 1988). Sheriffs and their deputies are "employees" of "public entities."

First, the Act broadly defines "employee" to include "an officer, director, employee or servant … who is authorized to perform any act or service." A.R.S. § 12-820(1). Because the

---

[1] Over two pages, Defendants argue why Maricopa County cannot be vicariously liable under federal law. Doc. 11 at 4:18-6:26. But the complaint is clear; Plaintiffs do not claim the county is vicariously liable under 42 U.S.C. § 1983, just state law. *See* Doc. 8 at 4:21-23 ("The Deputies Violated Edward's Rights Under the Fourth Amendment…And are Liable Pursuant to 42 U.S.C. § 1983").

CORE/3516995.0002/158440978.3

Arizona Legislature chose to define an "employee" as including not only common-law employees but also officers, directors and servants, it clearly intended its definition of "employee" to include officers *who were otherwise not employees*. If this were not so, then the references to "officer" and "director" would be superfluous, but courts presume the legislature intended every word in a statute to have meaning. *See Nicaise v. Sundaram*, 432 P.3d 925, 927 (2019) ("A cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous.").

Second, the Act ties its definition of "employee" to public entities like a county. "'Public employee' means an employee of a public entity." A.R.S. § 12-820(6). A county is a "public entity," which "includes this state and any political subdivision of this state." § 12-820(7). Counties are political subdivisions of the state. *Dowling v. Stapley*, 179 P.3d 960, 965 (App. 2008). Thus, the Act defines employees as including *officers* of a public entity, e.g. a county.

A sheriff is a county officer. *See* Ariz. Const. art. 12 § 3; A.R.S. § 11-401. So are a sheriffs' deputies, because they have all the powers and duties as appointed by a sheriff, including a sheriff's authority to perform law enforcement functions within the county. *See* A.R.S. § 38-462, § 11-441(A)(1); *Patton v. Mohave County*, 741 P.2d 301, 304 (Ariz. App. 1987). The legislature is presumed to have known that A.R.S. § 12-820 would include a sheriff, its deputies, and other county officers as "employees." *See Prudential v. Estate of Rojo-Pacheco*, 962 P.2d 213, 223 (Ariz. App. 1997) ("We presume that when the legislature enacts a statute, it is aware of existing statutes."). Against this backdrop, the Arizona Legislature stated that "public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state" and that the Act should "be construed with a view to carry out the above legislative purpose." *Doe ex rel. Doe v. State*, 24 P.3d 1269, 1271 (2001).

Incorporating the foregoing definitions, the Act codifies broad liability for governmental entities to anyone having "claims against a public entity, public school or a public employee," subject to compliance with the procedural notice of claim requirement.

3

A.R.S. § 12-821.01(A). Thus, where there is no specific grant of immunity within the Act, a county (a public entity) is liable for the acts of its statutorily-defined "employees," including the deputy sheriffs in this case. *See Warrington v. Tempe Elementary School Dist. No. 3*, 928 P.2d 673, 675 (Ariz. App. 1996) (concluding public entity was liable under the general rule of "governmental liability" because none of the immunity provisions within the Act applied).

Nothing in the Act grants immunity to a county under the circumstances alleged in Plaintiffs' complaint, where the deputies were performing law enforcement functions. None of the limited circumstances enumerated in A.R.S. § 12-820.01 (absolute immunity) and § 12-820.02 (qualified immunity) apply here. Therefore, under the clear legislative intent of the Act, a county is liable for the acts of the deputies, as the deputies—county officers—are within the Act's definition of "employees." *Cf. Hayes v. Continental Ins. Co.*, 872 P.2d 668, 672 (1994). (in construing a statute, courts consider its context, language, subject matter, historical background, effects and consequences, and its spirit and purpose).

## II. *Fridena* is distinguishable because it involved the limited circumstances where a sheriff acts as a judicial officer.

Defendants cite an almost fifty-year-old case, *Fridena v. Maricopa County*, for the proposition that a county cannot be vicariously liable for the acts of its sheriff or deputies. Their reliance is misplaced.

In *Fridena*, the plaintiff sued the county for "tortious conduct … in the issuance and service of a writ of restitution." 504 P.2d 58, 59 (1972). In the course of executing the writ, deputies physically removed the plaintiff from the premises and arrested her for obstructing justice. *Id.* 504 P.2d at 60. The *Fridena* court recognized that normally "the County exercises supervision of the official conduct of the Sheriff," but noted that "*in the instant case*, the County, having no right of control over the Sheriff or his deputies in service of the writ of restitution, is not liable under the doctrine of Respondeat superior for the Sheriff's torts." 504 P.2d at 61. (Emphasis supplied.) The *Fridena* court's use of the phrase "in the instant case" shows why context matters.

CORE/3516995.0002/158440978.3

For starters, executing a writ of restitution is a judicial—not an executive (i.e. county)—function. Arizona law on forcible detainer clearly demarcates that the sheriff executes writs of execution under direct orders from the Superior Court: "The writ of restitution or execution shall be issued by the clerk of the superior court and shall be executed by the sheriff or constable as in other actions." A.R.S. § 12-1181. In so doing, a sheriff is a court officer because the writ is issued *by the court* and the court orders a sheriff to execute it.[2] Thus, although a sheriff is typically a county officer, while executing a writ of restitution he acts under the order of the Superior Court, not the county. In doing so, he is a judicial officer under the control of the judicial branch. "Both the Arizona Supreme Court and this court have recognized that a sheriff, when carrying out certain of the statutory duties of the office, is acting as an officer of the court." *Clark v. Campbell*, 193 P.3d 320, 326 (App. 2008). "The court 'has jurisdiction either to exercise control over the act or to discipline the officer for doing or not doing it.'" *Id.* (citation omitted).

Arizona cases reinforce that a sheriff executing a writ of restitution is acting as a judicial officer because it has been long-held that Superior Court has the ***exclusive*** right to control the sheriff's deputies in the performance of court functions such as executing writs. *Merrill v. Phelps*, 84 P.2d 74, 78 (Ariz. 1938); *see Mann v. Maricopa County*, 456 P.2d 931, 936 (Ariz. 1969) ("[T]he Judiciary has the power of control over the personnel directly connected with the Courts"); *State ex rel. Andrews v. Superior Court of Maricopa County*, 5 P.2d 192, 194–95 (Ariz. 1931), *overruled on other grounds by Genda v. Superior Court*, 439 P.2d 811 (1968) (court had authority to control sheriffs' conduct when performing duties as a court officer).

The judicial branch's exclusive control over a sheriff who is executing writs derives from the Arizona Constitution. Ariz. Const. art. 6 § 3. In turn, the Arizona Supreme Court delegates this power to the Superior Court, which commands the sheriff. This power is held

---

[2] Correspondingly, there is no statute imposing upon a county the duty to execute writs of restitution. A county's power is entirely derivative and must be conferred by the State, either through the Arizona Constitution or a statute. *Transamerica Title Ins. Co. v. Cochise County*, 548 P.2d 416, 419 (Ariz. App. 1976).

5

entirely within the judicial branch and counties are not involved in any way. Similarly, in *Clark*, the Arizona Court of Appeals held that although a constable, like a sheriff, is an elected position, the Superior Court had the right "to exercise supervisory authority" over the constable and to "take appropriate and reasonable disciplinary action" over the constable for failure to "properly perform[] the statutory duties required of her in her capacity as an officer of the court." 219 Ariz. at 73, ¶ 26, 193 P.3d at 327. Thus, two points explain why despite *Fridena's* gloss, it does not apply to the law enforcement operations here.

First, in *Fridena*, the deputies were performing an exclusively judicial function that rendered them judicial—rather than executive—officers. Consequently, only the judicial branch of government could possibly control them, and it would violate the separation of powers to hold one branch of government responsible for another's torts. *See* Ariz. Const. art. 3 (none of the three separate "departments shall exercise the powers properly belonging to either of the others").

Second, *Fridena's* remark that the county had no vicarious liability because it lacked the right of control was *dicta*. The actual guiding principle was that the deputy sheriffs were acting as judicial officers. *Fridena* was unartfully written because after correctly recognizing that "[i]nasmuch as the Sheriff is a county officer" (implying that there, the Sheriff was not a county officer engaged in an executive function), the Court of Appeals continued to confusingly recite two consequences of the sheriff being a judicial officer (the County did not have the right to control and no vicarious liability) in such a way as to inadvertently imply that the lack of vicarious liability was the consequence of the lack of the right to control.

For the same reasons, *Hernandez v. Maricopa County* is also inapplicable. *Hernandez* involved a justice of the peace. The Court of Appeals held: "Justice of the peace courts, like the superior court, are part of the judicial department and thus they are not under the control of the executive branch of government." 673 P.2d 341, 344 (Ariz. App. 1983). For that reason, the county obviously had no right to control an officer under a different branch of government. *Id.*; *see also Yamamoto v. Santa Cruz County Bd. of Sup'rs*, 606 P.2d 28, 30 (Ariz. App. 1979) (reaching same conclusion on justice of peace and other court personnel).

6

*Arpaio v. Baca* confirms the distinction between a sheriff (or his deputies) acting as executive versus judicial officers. There, the Arizona Court of Appeals noted that in carrying out some of the sheriff's statutorily-enumerated duties, he acts as an "officer of the court." 177 P.3d 312, 321 (Ariz. App. 2008) (citing § 11–441(A)(4), (7)). However, "the sheriff does not act as an arm of the court in performing most of the other functions for which the sheriff is assigned responsibility under A.R.S. § 11–441(A)." *Id.* Thus, the Superior Court had no right to control the sheriff in his management of jail visitation. *Id.*

Thus, *Fridena*, read carefully, stands for the unremarkable proposition that when a sheriff is performing a judicial duty, the county cannot be liable. Furthermore, a sheriff's status as a county officer has no bearing on whether the officer is performing a judicial or executive function; it is the nature of the function being performed that drives the liability. *Cf. Collins v. Corbin*, 771 P.2d 1380, 1381 (Ariz. 1989) (justices of the peace are county officers but are part of the judicial branch, so the counties have no right to control them).

The Maricopa County Board of Supervisors is part of the executive branch. *Falcon ex rel. Sandoval v. Maricopa County*, 144 P.3d 1254, 1256 (Ariz. 2006). As alleged in the complaint, the deputy sheriffs who encountered Mr. Rudhman were charged with preserving the peace and enforcing laws—executive branch functions. *See Phoenix Newspapers, Inc. v. Superior Court In & For County of Maricopa*, 882 P.2d 1285, 1289–90 (Ariz. App. 1993). The separation of powers doctrine, which prevented liability in *Fridena* and *Hernandez*, is not implicated here.

Plaintiffs anticipate that Defendants may cite other non-binding decisions that have applied *Fridena* to thwart vicarious liability on the part of the county. The Court will see that those cases are missing the correct argument for county liability under the Act's statutory definitions of employees of public entities. Because the proper argument was never presented to the court in those cases, they also fail to correctly analyze the holding in *Fridena* as an application of separation of powers and whether an officer is acting under the judicial or the executive branch. Instead, those cases get hung up on the right to control and never consider the tapestry of Arizona law that confirms *Fridena* was simply a poorly-explained application

7

of the separation of powers without fully explaining that county officers sometimes serve different branches of government.

Under the Act—which was enacted after *Fridena*—the county is the public entity responsible for the acts of the deputy sheriffs who were acting as county officials—and thus "employees" under the Act. The County is vicariously liable.

**III.     The Act is consistent with common-sense liability for parallel county actors.**

Defendants argue that the sheriff is elected, as if this somehow precludes the county's liability for his deputies' actions. Doc. 8 at 19-20. This cannot be the case, because the bulk of county functions are performed by a number of elected *parallel* policymakers, each of whom is the final authority within his or her sphere of statutorily-prescribed duties and ultimately accountable only to the voters. A county is liable for each of its final policymakers, and to allow a county to duck liability because of this parallel power structure would revive sovereign immunity.

For example, a county's board of supervisors consists of elected members and its duties are statutorily prescribed, just like a sheriff's. *See* A.R.S. § 11-251. Yet no one seriously suggests that a county is not vicariously liable for the actions of its board of supervisors. Similarly, a county's attorney, treasurer, recorder, and assessor, among others, are also elected and discharge statutory duties. If the county is not liable for the sheriff's acts, then the county is not liable for any of these other officers, an absurd result that would revive sovereign immunity contrary to the Arizona Legislature's specific intent. As clearly evidenced in the Act, the legislature intended to impose liability on the county for the acts of all of its officials. Each is a final policymaker within his or her own realm. *See Flanders v. Maricopa County*, 54 P.3d 837, 847 (Ariz. App. 2002) (Sheriff was final policymaker such that the County was liable as a matter of law for § 1983 claim).

Judge Wake recognized the absurdity of interpreting *Fridena* in the context of the final parallel policymaker structure of Arizona counties:

> Ability to control really has nothing to do with liability. The Sheriff is the County. He is the final actor. It is simply not logical, doesn't serve any logical purpose, to say that the County escapes its liability because any one of its final

8

actors cannot be controlled by any of its other final actors. So I'm satisfied that [the county's argument] is clearly contrary to Arizona law.

Ex. 1 at 56-57. In that case, *Donahoe v. Arpaio*, Judge Wake intended to issue a ruling that declined to follow *Fridena* as a poorly-reasoned intermediate state appellate court decision, which he was not bound to follow if he was convinced that the Arizona Supreme Court would rule differently. *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007). However, *Donahoe* settled before any written opinion issued. This Court need not go as far as Judge Wake was prepared to go; it only need recognize that *Fridena* does not actually support the veneer that Defendants would give it.

**IV.   Maricopa County controls all litigation, and pays any judgment, involving its employees, including the sheriff and his deputies. It makes no sense, and is against public policy, that the county is not the proper party in a case, alleging vicarious liability, where any of its employees, especially a deputy sheriff, is sued.**

Arizona law expressly recognizes that the county is liable for the torts of all of its elected officials, employees or officers, because it allows a county to purchase liability insurance to cover torts committed by "its elected or appointed officials, employees or officers if such elected or appointed officials, employees or officers are acting within the scope of employment or authority." A.R.S. § 11-981(A)(2). And Arizona law specifically imposes upon the county an obligation to reimburse the sheriff for all necessary expenses, including litigation. *See* A.R.S. § 11-444. Arizona law also allows a county to elect to self-insure against this same tort liability, and the Maricopa County has done so. Pursuant to § 11-981(B), the county created the Maricopa County Self-Insured Risk Trust Fund. The Trust agreement, executed by the Board of Supervisors, provides that the Trustees of the fund shall pay "lawful claims of liability that are the obligation of the County."[3]

Like the Act, the Trust agreement explicitly includes the sheriff and his deputies in its definition of "Employees." "'Employees' means all persons who are paid a wage, or salary from public monies in accordance with official entries on the County payroll, officers, board

---

[3]   https://www.maricopa.gov/DocumentCenter/View/19902/Declaration-of-Trust-for-Self-Insured-Risk-Trust-Fund-PDF § 2.2.2.3.

members of the County." *Id.* § 1.7.7. The sheriff and his deputies are public officers of the county whose wages are paid from the county's monies. *See Patton*, 741 P.2d at 304-05.

Thus, not only does the county have the statutory obligation to pay all necessary expenses of the sheriff, including liabilities, but the county has assented in the Trust agreement to pay these liabilities. And consistent with this obligation, the county's self-insurance Trust recognizes that the county has the right to control litigation against the sheriff and to settle any claims. *Supra* note 3 §§ 2.2.3.1 (County Attorney may appoint counsel), 2.2.3.4 (settlement authority).

It is thus absurd for the county to claim that it is not a proper party, contrary to its own Trust agreement. And even aside from the county's express agreement to pay claims against the sheriff and its recognition of its right to control litigation against the sheriff, this Court has also recognized that the board of supervisors has the duty to supervise all of the sheriff's expenditures and to reject those that are not appropriate. *United States v. Maricopa County*, 151 F. Supp. 3d 998, 1015 (D. Ariz. 2015).

Finally, Defendants' argument, that Maricopa County is not a proper party, is contrary to public policy. "The legislative statement of purpose and intent in the act declares that it is 'the public policy of this state that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state.'" *Doe*, 24 P.3d at 1270-71 (quoting 1984 Ariz. Sess. Laws ch. 285, § 1). This makes sense. If Defendants' argument is accepted, a plaintiff's only recourse against a sheriff's deputy who causes an injury is against the deputy himself. In such a situation, the public employee will rarely have sufficient means to compensate a victim, especially one who has suffered a catastrophic injury. The is contrary to the very reason the Arizona Legislature passed the Act. [4]

---

[4]     The county may argue that the sheriff, sued in his official capacity, is the proper defendant when a plaintiff seeks to impose vicarious liability following the tort of a sheriff's deputy. This leads to an absurd result for two reasons. Arizona law recognizes "official capacity" suits for state law claims. *See* Ariz. R. Civ. P. 17(d) ("A public officer who sues or is sued in an official capacity may be identified as a party by the officer's official title rather than by name … ."); Ariz. R. Civ. P. 25(d) (when a public officer "who is a party in an official capacity" ceases to hold office, the officer's successor is automatically substituted as a party).

CORE/3516995.0002/158440978.3

For these reasons, Defendants' motion should be denied.

RESPECTFULLY SUBMITTED this 17th day of April, 2020.

**STINSON LLP**

By:  /s/ Larry J. Wulkan
Larry J. Wulkan
Jennifer L. Allen
Michael Vincent
Adrianna M. Chavez
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiff Lisa Yearick

**LAW OFFICES OF J. SCOTT HALVERSON PC**

By:  /s/ J. Scott Halverson
J. Scott Halverson
1761 E. McNair Drive, Suite 103
Tempe, Arizona 85283-5056
Attorney for Plaintiff Leigha Huber

---

The United States Supreme Court has held that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, n.55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. … [A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.* (Citations omitted). Here, the deputies acted in their official capacities as law enforcement officers when they shot Mr. Rudhman because they were within the course and scope of their employment. Doc. 8 at ¶ 42. They were county officers because the sheriff is a county officer and his deputies have the same powers. A.R.S. §§ 11-401(A)(1); A.R.S. § 38-462(A); *Patton*, 741 P.2d at 304. Any claim against the sheriff, in his official capacity, for the acts of his deputies is—by operation of law—a claim against the entity of which the sheriff is an agent. *See Kentucky*, 473 U.S. at 166.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2020, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system:

Charles Trullinger
Sherle Flaggman
Deputy County Attorneys
Civil Services Division
Security Center Building
222 N. Central Avenue, Suite 1100
Phoenix, AZ  85004
ca-civilmailbox@mcao.maricopa.gov

*Attorneys for Defendants*

By:   */s/ Kathleen Kaupke*

12

# Exhibit 1

1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                 _____

4

5     Gary Donahoe and Cherie      )
      Donahoe, husband and wife,   )
                                   )
6                   Plaintiffs,    )
      vs.                          )
7                                  )
      Sheriff Joseph Arpaio and Ava ) LEAD NO.
8     Arpaio, husband and wife; et ) CV 10-02756-PHX-NVW
      al.,                         )
9                   Defendants.    ) CONSOLIDATED WITH:
                                   ) NO. CV 10-02757-PHX-NVW
10    Susan Schuerman,             ) NO. CV 10-02758-PHX-NVW
                                   ) NO. CV 11-00116-PHX-NVW
11                  Plaintiff,     ) NO. CV 11-00262-PHX-NVW
      vs.                          ) NO. CV 11-00473-PHX-NVW
12                                 ) NO. CV 11-00902-PHX-NVW
      Sheriff Joseph Arpaio and Ava ) NO. CV 11-01921-PHX-NVW
13    Arpaio, husband and wife; et )
      al.,                         )
14                  Defendants.    )
                                   )
15    Conley D. Wolfswinkel, a     )
      single man; et al.,          )
16                                 )
                    Plaintiff,     )
17    vs.                          )
                                   )
18    Sheriff Joseph Arpaio and Ava )
      Arpaio, husband and wife; et )
19    al.,                         )
                    Defendants.    )
20                                 )
      Stephen Wetzel and Nancy     )
21    Wetzel, husband and wife,    )
                                   )
22                  Plaintiffs,    )
      vs.                          )
23                                 )
      Sheriff Joseph Arpaio and Ava )
24    Arpaio, husband and wife; et )
      al.,                         )
25                  Defendants.    )

```
1
        Sandra Wilson and Paul            )
2       Wilson, wife and husband,         )
                                          )
3                       Plaintiffs,       )
        vs.                               )
4                                         )
        Sheriff Joseph Arpaio and Ava     )
5       Arpaio, husband and wife; et      )
        al.,                              )
6                                         )
                        Defendants.       )
7                                         )
        Mary Rose and Earl Wilcox,        )
8       wife and husband,                 )
                                          )
9                       Plaintiffs,       )
        vs.                               )
10                                        )
        Sheriff Joseph Arpaio and Ava     )
11      Arpaio, husband and wife; et      )
        al.,                              )
12                                        )
                        Defendants.       )
13                                        )
        Donald T. Stapley, Jr. and        )
14      Kathleen Stapley, husband and     )
        wife,                             )
15                      Plaintiffs,       )
        vs.                               )
16                                        )
        Sheriff Joseph Arpaio and Ava     )
17      Arpaio, husband and wife; et      )
        al.,                              )
18                      Defendants.       )

19              BEFORE:  THE HONORABLE NEIL V. WAKE
                   UNITED STATES DISTRICT JUDGE
20                      (Motion Hearing)
                       Phoenix, Arizona
21                     October 30, 2013
        Official Court Reporter:
22      Laurie A. Adams, RMR, CRR
        Sandra Day O'Connor U.S. Courthouse, Suite 312
23      401 West Washington Street, SPC 43
        Phoenix, Arizona 85003-2151
24      (602) 322-7256
        Proceedings Reported by Stenographic Court Reporter
25      Transcript Prepared by Computer-Aided Transcription
```

3

```
 1    APPEARANCES:

 2    For the Plaintiffs Donahoe and Stapley:
              STINSON MORRISON HECKER LLP - Phoenix
 3            By:  Stefan M. Palys, Esq.
              By:  Lawrence J. Wulkan, Esq.
 4            1850 N. Central Avenue
              Suite 2100
 5            Phoenix, AZ 85004

 6    For the Defendants Arpaio:
              AUDILETT KASTNER PC
 7            By:  Daryl A. Audilett, Esq. (Telephonic)
              335 N. Wilmot Rd.
 8            Suite 500
              Tucson, AZ 85711-2636
 9
      For the Defendant Aubuchon:
10            MUELLER & DRURY PLLC
              By:  Douglas Drury, Esq. (Telephonic)
11            8110 E. Cactus Rd.
              Suite 105
12            Scottsdale, AZ 85260-5210

13    For the Defendant Thomas:
              BROENING OBERG WOODS & WILSON PC
14            By:  Sarah L. Barnes, Esq. (Telephonic)
              PO Box 20527
15            Phoenix, AZ 85036-0527

16    For the Defendant Hendershott:
              THOMAS THOMAS & MARKSON PC
17            By:  Barry M. Markson, Esq. (Telephonic)
              2700 N Central Ave.
18            Suite 800
              Phoenix, AZ 85004
19
      For the Defendant Maricopa County:
20            SACKS TIERNEY PA
              By:  Jeffrey S. Leonard, Esq.
21            4250 N. Drinkwater Blvd.
              4th Floor
22            Scottsdale, AZ 85251-3647

23

24

25
```

4

<pre>
 1                    P R O C E E D I N G S

 2                         9:06 a.m.

 3          THE COURTROOM DEPUTY:  This is Civil Case 2010-2756,

 4   Gary Donahoe et al. Versus Joseph Arpaio et al.  This is the

 5   time set for oral argument.

 6          Counsel, please announce for the record.

 7          MR. PALYS:  Good morning.  Stefan Palys and Larry

 8   Wulkan for the plaintiffs.  And Mr. Stapley is here with us

 9   this morning.

10          MR. LEONARD:  Good morning, Your Honor.  Jeff Leonard

11   on behalf of defendant Maricopa County.

12          THE COURT:  All right.  Good morning, counsel.  Oh,

13   we've got more.  Go ahead.

14          MR. DRURY:  Douglas Drury on behalf of the Aubuchon

15   defendants.

16          MR. AUDILETT:  Daryl Audilett for the Arpaio

17   defendants.

18          MR. MARKSON:  Barry Markson for the Hendershott

19   defendants.

20          MS. BARNES:  Sarah Barnes for the Thomas defendants.

21          THE COURT:  All right.  Thank you.  Good morning,

22   everyone.

23          I have some questions I want to address and I will

24   hear anything else anybody would, well, the interested parties,

25   would like to say.
</pre>

1          Mr. Leonard, why don't you come up to the podium.  The

2     microphone is better there and I have some questions for you

3     first.  It's your motion.

4          First, I want to be clear what we're not talking

5     about.  Is -- now, when I say "the County," unless I say

6     otherwise, what I'm meaning to say most of the time is the

7     juridical entity that's identified in the Arizona Constitution

8     as Maricopa County, a body politic.  That's what I'm talking

9     about when I say the County.  I might, at times, want to talk

10    about the Board of Supervisors.  But when I want to do that, I

11    will try to say that.  Might get confused, but that's the

12    distinction I want to have clear in our discussion.

13          Now, is the County contending that it is not -- and

14    also, I'm going use I'm going to say -- use the word torts

15    here.  And let me define what in general I want to be meaning

16    by that.  By that, I mean the torts of employees.  I'm going to

17    be meaning ordinary negligence and intentional torts for which

18    private parties would be liable.  And I mean to exclude from my

19    discussion the other things that sometimes arises, like in the

20    Grim case, about things that only government people can do and

21    that are interesting and important questions about when tort

22    law would intersect in a way to control governmental

23    discretion.  I'm not talking about that.  Right now, today, I

24    just want to talk about garden variety torts, negligence,

25    intentional torts, that of the same character that private

1     actors commit and for which they are liable.

2          So with that background my first question, Mr.

3     Leonard, and I think I know the answer to this but I want to be

4     clear, is the County contending that it is not liable for

5     ordinary torts committed by employees, for people who are

6     ultimately supervised by the Board of Supervisors through its

7     chain of command?

8          MR. LEONARD:  Your Honor, there are a few assumptions

9     packed into that question.

10         THE COURT:  I have tried to say them straight out.

11         MR. LEONARD:  Yes.  Because the answer to your

12    question is, I'm afraid, is both yes and no.  And if I can

13    clarify where I think the problematic assumption is, and that

14    is the question of control.

15         THE COURT:  No.  No.  I'm -- the premise I put to you,

16    well, if I didn't, I apologize.  But I meant to say torts

17    committed by employees in the course and scope of carrying out

18    their duties for the County, not when they are shopping for

19    groceries after they have left duty on their way home; conduct

20    in the course and scope of county business that constitutes a

21    tort.  You drive over a lady in the crosswalk when you are

22    driving a county vehicle on county business or maybe something

23    worse.  May get out and punch her in the face afterwards, an

24    intentional tort.  That's packed into my question.

25         MR. LEONARD:  I understand, Your Honor.  And my only

1  point of concern in your question was when you mentioned the

2  conduct that was supervised by the Board of Supervisors.

3          THE COURT:  I didn't use that phrase.  My phrase is

4  conduct by employees of the County in the course and scope of

5  their county business that would be actionable as torts if it

6  is done by a private person.

7          MR. LEONARD:  And the answer to that question, Your

8  Honor, is yes.

9          THE COURT:  Why?

10         MR. LEONARD:  We're talking about pure --

11         THE COURT:  Why?  Why?  Why is the County liable for

12 those torts?

13         MR. LEONARD:  I'm sorry, why is?

14         THE COURT:  Why is it liable?  Yeah.

15         MR. LEONARD:  Under the tradition, and we're talking

16 about state law claims, we're not talking about 1983 claims.

17         THE COURT:  Right.

18         MR. LEONARD:  State law claims under the -- by

19 application of the ordinary rules of state law tort employer

20 liability.  And Your Honor said if it is within the course and

21 scope of the employment, and if we simply look at the -- and we

22 don't even need yet to get to the Fridena case.

23         THE COURT:  I'm not there yet.

24         MR. LEONARD:  I understand.

25         THE COURT:  I'm sorry for interrupting your answer.

1      Because I do want to -- I'm not smart enough to talk about all

2      these things all at the same time.  I want to talk about them

3      one at a time.  So this is my first starting point.

4              MR. LEONARD:  And so if we look at application of

5      ordinary, ordinary principles of Arizona law as applied by the

6      Courts on a fairly consistent basis, what we're looking for is

7      if it is conduct that is within the course and scope of the

8      employment, as defined -- and if you look, for example, Your

9      Honor, the Arizona Supreme Court opinion in the Engler case

10     which we have cited in our papers, the Arizona Supreme Court as

11     recently as last year, this is a 2012 case, specifically

12     referred to and adopted by its very language, Restatement

13     (Third) of Agency and the principles of course and scope of

14     employment, how that's defined.  And there is inherent within

15     that analysis the doctrine of control.  If you don't control

16     the activity, the particular activity of the employee, and

17     that's where they get into this where you get into this

18     discussion of, well, what if it was, you know, not on county

19     time or --

20             THE COURT:  I'm not talking about that.

21             MR. LEONARD:  No.  I understand.  But that's why it is

22     important within -- and it is inherent within the concept of

23     control.

24             THE COURT:  Why is the County liable at all for torts

25     of its employees?  Why is it liable?

1          MR. LEONARD:  Because under the law of, whether you

2     want to call it master and servant or principal and agent, if

3     they are the principal, if they have an agent, if they are the

4     master, if they are the employer and they have an employee, and

5     the employee commits a tort under the ordinary common law as

6     set out in the Restatement then all the Arizona cases of master

7     and servant, then there is -- if you fall within that

8     definition then there is liability.  It's been the law for

9     hundreds of years.

10          THE COURT:  Well, actually, in Arizona, until the

11     judicial abolition of sovereign immunity by the Supreme Court,

12     I mean there were cases that are sort of murky, but in general,

13     state and municipal, municipalities, didn't have to pay because

14     of this judge-made doctrine that the cost of torts will fall on

15     the unfortunate person whom it hits rather than be shared by

16     the public whose business was being done by the tortfeasor at

17     the time.  That was the law before the Stone case.

18          MR. LEONARD:  Yes.

19          THE COURT:  And so now we have, in 19, what, 63,

20     thereabouts, the Supreme Court said that doesn't make any

21     sense.  We're rejecting that.  So the paradigm, it was totally

22     turned around.  And the general principles by which we

23     attribute liability within organizations are going to apply to

24     the state and municipalities as well with a big, big, carve

25     out.

```
 1            MR. LEONARD:  Sure.
 2            THE COURT:  About the not going to allow juries to
 3    second guess discretionary judgments about government actors,
 4    because government actors have to make discretionary decisions.
 5    And they do things all the time that plenty of people will
 6    disagree with.  Sometimes most people disagree.  But they are
 7    not liable just for making poor decisions in government.  They
 8    are liable to the same extent as all other organizations for
 9    the kind of torts, negligence, potential torts, that a private
10    person would be liable for.  Right?
11            MR. LEONARD:  Correct.  And that's why we're not up
12    here arguing any kind of sovereign immunity or non-liability on
13    that basis.
14            THE COURT:  So let's go -- now, this motion, really
15    this case has to do with the Sheriff and the County Attorney
16    and some of their deputies.
17            MR. LEONARD:  Yes.  May I just take a step back?
18            THE COURT:  Yes.
19            MR. LEONARD:  Before you move on though, Your Honor,
20    and that's why I keep emphasizing the -- and again, although
21    it's not a governmental liability case, the Engler case, the
22    2012 Arizona Supreme Court case which specifically adopts and
23    approves the Restatement (Third) of Agency definition.  And I
24    think Your Honor started this line of questioning by saying
25    acts committed within the course and scope of employment.  And
```

```
 1    it is very clearly set out in the Restatement, an employer is
 2    subject to vicarious liability -- and that's what we're talking
 3    about here -- for a tort committed by its employee acting
 4    within the scope of employment.  But then it goes on.  An
 5    employee acts within the scope of employment when performing
 6    work assigned by the employer or engaging in a course of
 7    conduct subject to the employer's control.  And that's why I
 8    started this, the answer to your question, Your Honor, by
 9    saying I think the issue of control is of critical significance
10    here.  Because you can't be acting --
11         THE COURT:  Well, we'll get to that.  I want to hear
12    what you have to say about that, and the other side as well.
13    But I'm just trying to take this a bite at a time.  I think we
14    have digested the first bite.
15         Now I want to get to -- your argument here is that
16    because the Sheriff and County Attorney, their actions are
17    entrusted, their ultimate actions are entrusted to them and are
18    not subject to revision by the Board of Supervisors, that the
19    County doesn't have to pay for torts committed in those
20    offices, even though the exact same tort committed by somebody
21    in the down line under the Board of Supervisors would be a
22    liability to the County and the County would have to pay for
23    it.  That is your argument, correct?
24         MR. LEONARD:  If -- I'm not 100 percent sure I quite
25    follow that.  But I think if what you're saying, Your Honor, is
```

1    is it our position that if a non -- someone who is not the

2    Maricopa County Sheriff or the Maricopa County Attorney

3    committed the same tort, although I'm not sure it could be the

4    same tort, but trying to think of one that's alleged that could

5    be committed outside of those offices, would the County be

6    liable, then the answer, unless there's some other governing

7    statute, unless there is -- the carrying out of those

8    responsibilities is committed by statute to some other

9    constitutional or statutory office, then the answer would be

10   yes.

11        THE COURT:  Okay.  And so what your motion poses, of

12   course, is grounded in the circumstances of this case.  We're

13   dealing with the Sheriff's Office, County Attorney Office, both

14   the elected officers and their deputies.  But in order to

15   understand the principle you urge, I'm going to ask you a

16   hypothetical question.

17        First of all, let me be clear.  You are arguing that

18   the County is not liable for any torts committed by the Sheriff

19   or the County attorney or any of their deputies, correct?

20   That's your argument?

21        MR. LEONARD:  If --

22        THE COURT:  Of course, we're only talking about state

23   law here.

24        MR. LEONARD:  If it is a tort committed in the course

25   of the Sheriff or the County Attorney carrying out their

1    statutory duties, activities that are committed to them by

2    statute.

3              THE COURT:  That's the only things they do.

4              MR. LEONARD:  Well, it's --

5              THE COURT:  They don't do anything else.

6              MR. LEONARD:  Your Honor, it's been argued otherwise

7    by the plaintiff that that's the only thing they do.  Because,

8    for example, the argument is made in the papers on this motion

9    that, for example, the filing of a civil RICO action is not

10   something that's committed to the County Attorney or Sheriff by

11   --

12             THE COURT:  The legal representation of county

13   officers is committed to the County Attorney, period.  And you

14   guys sue each other all the time in state courts about the

15   County Attorney's exclusive authority to do stuff like that.

16             MR. LEONARD:  Yes.

17             THE COURT:  So I want to come back to my question.  It

18   does appear to me, and I want to be clear, that your argument

19   is, that the County doesn't have to pay for the torts committed

20   by the County Attorney, the Sheriff, or any of their deputies.

21   Right?  Even though it would have to pay for torts committed by

22   similar employees in whose chain of command ultimately goes up

23   to the Board of Supervisors.

24             MR. LEONARD:  Your Honor, I guess with the

25   qualification I made, I think that's generally correct.

1        THE COURT:  Okay.  Are there any other officers for

2   who -- for the officers or their deputies for whom the logic of

3   your principle would require the same conclusion?

4        MR. LEONARD:  Frankly, I haven't thought about that,

5   Your Honor.  I don't know whether the Treasurer would be the

6   same.

7        THE COURT:  There's a lot of elected county officers,

8   the Treasurer, there's a bunch of -- but they are all entrusted

9   with duties by law.  It's just like the Sheriff and the County

10  Attorney, right?

11       MR. LEONARD:  If the -- now I need to be careful here

12  in using the term county because I understand how Your Honor --

13       THE COURT:  We've got the Clerk of the Superior Court

14  the Treasurer, the Assessor -- I mean, just going off the top

15  of my head -- all under the logic of your legal proposition,

16  the County is not liable for torts committed by them or any

17  other deputies, is it?

18       MR. LEONARD:  Your Honor, if you don't have control

19  over the activity, then you don't have vicarious liability

20  under the doctrine of respondeat superior.  And that's what's

21  being argued here.

22       THE COURT:  You know, I -- Mr. Leonard, you and I go

23  way back and you know what great respect I have for you.  But I

24  do want a clear answer.  Isn't the proposition that you are

25  putting forward, doesn't it mean that the County will not be

```
 1    liable for the torts committed by any elected official or any
 2    of their subordinates?  That includes the Treasurer, the Clerk
 3    of the Superior Court, the Assessor, and all the others.
 4              MR. LEONARD:  The answer, Your Honor, is yes.  If
 5    there's no control, there's no vicarious liability.
 6              THE COURT:  So --
 7              MR. LEONARD:  And there can't be under -- we're not
 8    talking about county law.  We're not talking about governmental
 9    law.  We're talking about the pure common law of employer
10    liability.
11              THE COURT:  Now, this is what I thought.  So I do
12    appreciate your directness in framing your proposition clearly.
13              When those elected officers, or their subordinates
14    commit torts, ordinary torts, is there any governmental money
15    available to compensate the victims of those torts?  By law,
16    and I want to put aside now this indemnification agreement the
17    County has done.  I'm only talking by law, is there any public
18    money available of right to injured people to be compensated
19    for the torts committed by any of the elected officials or any
20    of their subordinates?
21              MR. LEONARD:  I honestly do not know the answer to
22    that question, Your Honor.
23              THE COURT:  Well, we already know that your
24    proposition is the County money is not available.  What else
25    would there be?  Is the State Treasury open to pay the torts of
```

1   all these county employees who happen to work under the

2   direction of directly elected county officials?  Is the State

3   Treasury open for that?

4          MR. LEONARD:  Your Honor, the question is an

5   overstatement, I think, because again, it's a question of

6   control.  Just because someone is an elected official --

7          THE COURT:  This is real simple.  Somebody gets a

8   judgment.  The Sheriff goes out to execute.  Is there any

9   public money that can be executed on to compensate for those

10  torts?  It's a yes or no question.

11         MR. LEONARD:  And again, in all honesty, Your Honor, I

12  do not know the answer.

13         THE COURT:  I have to take your answer is you don't

14  know because you can't think of any public money that would be

15  available.  And under your legal theory, I can't think of any

16  public money that would be available to compensate any of those

17  victims either.

18         MR. LEONARD:  Correct.

19         THE COURT:  So now, this -- I know the question now

20  that I'm going to touch on really touches on the Fridena case.

21  And by the way, I'm acutely aware that it is a grave matter for

22  a federal court to reject the holdings of an intermediate

23  appellate court of the state.  And under the law, a federal

24  court can only do that if it's firmly convinced that those

25  decisions of the intermediate appellate court are contrary to

1    state law.  I fully understand that.  So it's not a matter of,

2    well, I have a different view.  I have to firmly believe that

3    the Fridena line of cases -- which has been repeated without

4    analysis for 40 years in the Arizona Court of Appeals, but

5    never endorsed by the Arizona Supreme Court -- to reject them,

6    I have to be persuaded there is clearly wrong.  I understand

7    the gravity of that.

8            Now, with respect to this theory of control, Fridena

9    was actually a deputy sheriff being sued.  It wasn't the

10   Sheriff.  And right now I don't want to talk about that case or

11   logic or persuasion.  But just in the abstract, is it not

12   correct that a deputy sheriff is within the control of the

13   Sheriff, within the garden variety understanding of notions of

14   respondeat superior, he's subject to the control of the

15   Sheriff?

16           MR. LEONARD:  Yes.

17           THE COURT:  And that would be true of every other

18   subordinate county employee under every elected county officer,

19   right?

20           MR. LEONARD:  Yes.

21           THE COURT:  So the respondeat superior principle that

22   really is just a -- it's a way to set boundaries for what is

23   the -- what is properly chargeable to the entity, the superior,

24   and what is just simply the private affairs of somebody who

25   also works for the government or works -- that's what the

18

1    function of the respondeat superior doctrine is.  And we can

2    talk later about the details of how it would apply here.

3          So I think -- I appreciate your answer.  You have

4    acknowledged that the respondeat superior principle does apply

5    as between the Sheriff, any other elected official, and all

6    their employees.

7          So the principle that you rely upon in this motion

8    does appear to me to boil down to the assertion that because

9    the Board of Supervisors cannot control the Sheriff, or the

10   County Attorney, or as I think we have agreed here, any other

11   directly elected county official, that breaks the bond of

12   liability that separates the County fisc from compensating

13   victims of torts.  That's your proposition, isn't it?

14         MR. LEONARD:  It is, Your Honor, because that's the

15   common law analysis.

16         THE COURT:  Now, and I just want to touch briefly on

17   the Fridena line of cases.  Again, the discussion in that case

18   is one paragraph long.  I have pulled up the briefs in the

19   Arizona Court of Appeals.  I have read them all.  The sum and

20   substance of the briefing in Fridena was also one paragraph.

21   So we are dealing with nothing more than bare assertions, in

22   both the brief for the prevailing party and the Court of

23   Appeals in their ruling.  And it appears to me, among other

24   things, that the Fridena court merged together the respondeat

25   superior theory between the Sheriff not being subject to the

1    control of the Board of Supervisors and the deputy not being

2    subject to control.  Perhaps the Court was thinking that well,

3    the deputy is not subject to the control of the Board of

4    Supervisors, even though he is subject to the control of the

5    Sheriff.

6          Am I missing anything in that description?

7          MR. LEONARD:  Well, Your Honor, I think your

8    description accurately describes the circumstances of the case.

9    I don't necessarily agree that it's a material difference.

10          THE COURT:  Well, it is appearing to me that your

11    argument -- and by the way, I have been getting this motion

12    repeatedly from the County in lots of cases in the last few

13    years.  And a lot of times, the County does not raise this

14    point.  It just goes through, and sometimes they are raising

15    this point.

16          But it does appear to me that it all comes down to the

17    theory that because the Board of Supervisors by law cannot

18    control other directly elected county officials, there's no

19    respondeat superior from the elected officials, and therefore a

20    break in liability.  That appears to me to be the proposition,

21    and I want to give you the chance to tell me if I'm

22    misunderstanding the nature of your argument.

23          And that sort of seems to be what the Fridena cases

24    say.

25          MR. LEONARD:  I think that that may fairly state the

```
 1    argument, Your Honor.  Again, it's a question of control.  And

 2    if I may, Fridena has been cited not only over, as Your Honor

 3    said, over a period of 40 years by the Arizona Court of

 4    Appeals.  And I know that denial of review has no

 5    precedential --

 6              THE COURT:  Means the case is boring, badly briefed,

 7    not a good set of facts, or they have other things on their

 8    mind.

 9              MR. LEONARD:  But it's also been cited -- we cited

10    three decisions in the District of Arizona that have cited it.

11    I went back and found another three, including several that

12    actually discussed the issue cited by Judge Broomfield, by

13    Judge Bury in Tucson.

14              But the -- I'm beginning to sound repetitive and

15    boring.

16              THE COURT:  But you know, you remember in -- I think

17    it's in Genesis, where the Lord tested the fidelity of Abraham

18    by commanding him to thrust his dagger into the breast of his

19    beloved son, Isaac.

20              MR. LEONARD:  Indeed.

21              THE COURT:  Well, we do that all the time under state

22    law.  So if my colleagues were doing that -- by the way, he

23    didn't actually have to kill his son, if you read the whole

24    story.  But we do that all the time.

25              MR. LEONARD:  Seemed to work out in the end.
```

1          THE COURT:  Right.  So if my colleagues have taken it

2     at face value, it really doesn't answer the question that's now

3     posed to me as to whether those cases in fact are contrary to

4     Arizona law and, therefore, should not follow.

5          MR. LEONARD:  I understand that, Your Honor.  And my

6     only point there was that in one or two of those decisions,

7     there's actually a discussion of the control issue.

8          But when I started to say I'm sounding repetitive and

9     boring, it's because I come back to the question of control.

10          THE COURT:  Well, let's talk about that.  We have

11     already agreed, and you have conceded, that the County has to

12     pay the torts of employees committed in the course and scope of

13     employment if they are under the line of command of the Board

14     of Supervisors.  But why is that?  There's nobody that can

15     control the Board of Supervisors.  Why is it that those people,

16     the County has to pay for, when nobody can control the Board of

17     Supervisors?  Just like nobody can control the Sheriff?  Why

18     are we paying for the people under the Board of Supervisors,

19     when nobody can control them, but we're not paying for the

20     people under the Sheriff, when nobody controlled the Sheriff

21     either.  Both of them are elected.  They answer to the voters

22     and the law, and no one else.

23          MR. LEONARD:  Because, Your Honor, the Board of

24     Supervisors represents the body of the County.

25          THE COURT:  So does the Sheriff.  He's just as

1    directly elected as the Board of Supervisors.  He derives his

2    legitimacy from the assent of the governed in the exact same

3    way, does he not?

4        MR. LEONARD:  Yes.  But I'm not sure why we're

5    settling on the Board of Supervisors, Your Honor.  Essentially,

6    the chief executive of the county is the County Manager, not

7    the Board of Supervisors.

8        THE COURT:  The Sheriff is the chief executive of the

9    county for all matters within his statutory and constitutional

10   responsibility.

11       MR. LEONARD:  Indeed.

12       THE COURT:  As is the County Attorney.

13       MR. LEONARD:  Indeed.

14       THE COURT:  For his area.  As is the Board of

15   Supervisors for their area.  So I'm trying to figure out why it

16   is that nobody -- the County doesn't have to pay for the acts

17   done under the Sheriff's supervision, but they do have to pay

18   for the acts done under the Board of Supervisors.

19       MR. LEONARD:  I'm still going to throw in the County

20   Manager into this mix.

21       THE COURT:  He works for the Board of Supervisors.

22       MR. LEONARD:  Well, I understand.  But the Sheriff

23   does not work for the Board of Supervisors.  And the County

24   Attorney does not work for the Board of Supervisors.  So

25   whether you want to call it the Board of Supervisors or the

23

1    County Manager, they can control -- I mean look, it's a big

2    organization.  It's a big bureaucracy.  They don't exercise

3    day-to-day control, but through the organizational chart they

4    control the activities of the line employees of the county.  So

5    if a Department of Transportation employee commits a tort,

6    there is ultimate responsibility.  So, I mean, assuming there's

7    some other legal liability there.

8          But there is responsibility because there is that,

9    within the Restatement definition, the employer is subject to

10   vicarious liability because they can dictate the terms of

11   carrying out the employees' duties.  They cannot dictate the

12   terms of the Sheriff's carrying out his duties.

13         Now, we can argue over that.  And in fact, the

14   plaintiffs do.  But whether they can or not, but that is a

15   given in my answer to the Court's question.  That's the

16   difference.

17         THE COURT:  But I put it to you that the Sheriff, by

18   law, is the final actor for the County on the matters within

19   his responsibility, exactly as the Board of Supervisors is the

20   final actor for the County on the matters under its

21   jurisdiction, and that they are parallel.  Neither one can

22   control the other.  They both act for the County, and that

23   therefore, there need be no respondeat superior relationship as

24   between parallel final actors for the County.  I put it to you,

25   and tell me why that is not correct.

1          MR. LEONARD:  I think it's not correct, Your Honor,

2     because it's apples and oranges.  The County, as the juridical

3     entity is -- whether someone works for, and I said other line

4     employees work for the County Manager, not for the board.  But

5     the Board of Supervisors is the ultimate, as Your Honor has

6     pointed out, the ultimate governing authority.  They can set

7     the rules.  They can set the terms of employment.  They can set

8     the terms of how work is carried out.

9          Now, it's done through the County Manager.  They

10    cannot set the terms under which the Sheriff carries out his

11    duties.  They can demand reports.

12         THE COURT:  But the Sheriff sets them.

13         MR. LEONARD:  Yes.

14         THE COURT:  I mean they're --

15         MR. LEONARD:  And that may make him, and that may make

16    him, depending on how the facts fall, that may make the County

17    liable under, for example, a 1983 theory, because that's the

18    way --

19         THE COURT:  We're not talking about federal law.

20         MR. LEONARD:  No.  I understand.  But I want to

21    highlight the difference because that's the way the law has

22    developed.  That's the way the civil rights act was enacted and

23    the cases have developed.

24         But the fact that he is a final actor or a final

25    policy maker does not make the County responsible for his acts.

1    That, in fact, is the point made in, for example -- I don't

2    want to keep going back to 1983.  But that is precisely the

3    point made in, for example, in Monell, in Pembaur.  That's why

4    there's a difference there.  There is no vicarious liability.

5    That's why there's no vicarious liability for the County under

6    1983.  Because there is that difference, because as -- if the

7    Sheriff is a final policy maker, if he is, and if he --

8           THE COURT:  Well, he clearly is.  That's beyond

9    dispute.  He is.

10          MR. LEONARD:  Well, I'm just tying it to the facts of

11    any particular case.  I just don't want to be standing up here

12    making some sort of concession that in this case, the facts

13    fall in a certain way.  I understand that, the point Your Honor

14    makes.

15          But that's why Monell and Pembaur and those cases

16    point out that there is no vicarious liability for the County.

17    Otherwise, there would be absolutely no reason to distinguish

18    the two.  And you could have the County as vicariously liable

19    under 1983 which, obviously, you can't.  And that is the

20    difference there.

21          So there is no -- there is no ability for the policy

22    makers for the ultimate authority of the County to control the

23    way the Sheriff --

24          THE COURT:  But the Board of Supervisors is not the

25    ultimate authority for the County.  It is the ultimate

1    authority for the County for the things entrusted to it.

2              MR. LEONARD:  Yes.

3              THE COURT:  And the Sheriff is the ultimate authority

4    for the things entrusted to him, the County Attorney, and so

5    on.  So this seems to be nothing but a word game that's trying

6    to -- is asserting that the County really is a monarchy run by

7    the Board of Supervisors, and because we have this independent

8    kingdom within the monarchy, it doesn't have to pay.  It's not

9    a monarchy.  The constitution is clear as day.  The County

10   government is divided among different people ultimately

11   responsible to no one but the law and the voters.  And so

12   that's the -- to put it another way, I'm charged on this motion

13   with making a grave decision about whether Fridena and those

14   line of cases are clearly contrary to Arizona law.  And it is

15   seeming to me that there is no logic or principle whatever to

16   this holding in Fridena that the County has -- the Board of

17   Supervisors -- has to be able to control the Sheriff for the

18   County fisc to answer for the Sheriff.  There is just -- that

19   is a nonsensical assertion.  With all respect to distinguished

20   counsel who won that case, distinguished counsel probably won

21   that case because he's so smart, he knew if he said more than a

22   paragraph, he would expose the fallacy of his argument.  And

23   instead, he won with one paragraph.

24             MR. LEONARD:  If I may, Your Honor, let me mention the

25   Dimidowich case, a Ninth Circuit case which I know Your Honor

1   has cited and that we have cited.  And that's the one that we

2   cite for the proposition that, as Your Honor readily states,

3   decisions by intermediate state courts are not to be lightly

4   disregarded unless you find persuasive data otherwise.

5           But here's why I mention that case.  In Dimidowich, a

6   Ninth Circuit case which involved California law, the Ninth

7   Circuit concludes that the reason -- and you know, in a way

8   citing Dimidowich is maybe -- it violates, I think, what we

9   used to call the Jack Brown Rule:  Don't cite a case that comes

10  out the wrong way.

11          THE COURT:  I always followed that rule when I was a

12  lawyer.

13          MR. LEONARD:  It's a good rule.

14          THE COURT:  Great language, bad holding, so --

15          MR. LEONARD:  Right.  Because it's going to come back

16  and bite you.  I understand.

17          But here's what happens in Dimidowich.  The Ninth

18  Circuit says, here's why we have reason to believe that the

19  California Supreme Court, which had not ruled on that

20  particular issue, and it's an issue of vertical

21  distributorships and horizontal distributorships and per se

22  rules.  And it says, we don't think -- this is a case that was

23  sort of a case of first impression, as far as the factual

24  scenario in the Court of Appeals.  And here, there is a history

25  of California cases, Supreme Court cases, that say that we

```
 1    don't apply a per se rule without a sufficient development of
 2    the facts where it's a new area.  And so we, therefore, said
 3    the Ninth Circuit, we can say that we don't think the
 4    California Supreme Court would have applied a per se rule.  And
 5    the reason I raise that case, Your Honor, is this.  Okay, you
 6    have Fridena.  And I understand the Court's questions about
 7    Fridena.  1972 case.  It is cited and relied upon in a series
 8    of subsequent Arizona Court of Appeals cases over the years.
 9    It's cited and relied upon and even discussed, and I found at
10    least six district of Arizona cases over the years, including
11    one from July of this year.  There is not a single -- unless
12    I'm mistaken, Your Honor, there isn't a single case, over 40
13    years, that's been cited by the plaintiffs or that we have
14    seen, either an Arizona state case or a federal case discussing
15    the Fridena point, that has taken any difference with Fridena.
16    So you have 40 years of Fridena being cited.
17           THE COURT:  Well, part of the problem is that under
18    Arizona law, the Superior Court judges statewide must follow
19    the Court of Appeals decision.  So you have frozen the ability
20    in the state court process to come up with different
21    conclusions.  It's dependent on it coming up in the Court of
22    Appeals.  And it's never gotten to the Supreme Court.  The
23    reasons are fairly inferable, the things I already referred to.
24    Plus we have the fact -- which is obvious -- that the counties
25    in general, and Maricopa County in particular, notwithstanding
```

 1    Fridena, pay these torts all the time.  So they eliminate the

 2    prospect of further appellate review by simply rolling over and

 3    paying them.  It happens all the -- you know that.  We all know

 4    that.  I mean, it kind of reminds me of the urban legend of the

 5    aeronautical engineer who wrote a long scientific paper proving

 6    conclusively that a bumblebee cannot fly.  But the bumblebee

 7    does fly.  Fridena is out there, but notwithstanding Fridena,

 8    the Counties are paying these torts all the time.

 9          MR. LEONARD:  But the County has several roles, Your

10    Honor, as you know.  And Pauline Hecker is sitting right out

11    here.  The County's Director of Risk Management is the head of

12    the County's -- call it an insurance fund.  So the County is an

13    insurer as well as an employer.  So I don't want to mix --

14    again, I think that's apples and oranges.  The fact that the

15    County may pay --

16          THE COURT:  But if the County has no liability for the

17    torts committed by deputy sheriffs, isn't the County giving

18    away public money when it pays those torts under its indemnity

19    agreement?  If it doesn't have legal authority to do it, isn't

20    it an illegal gift?  There are old cases, as you recall,

21    there's statutes that say the supervisors are personally liable

22    for unauthorized payments of public money.  So are the

23    supervisors liable for all those torts they paid off for deputy

24    sheriffs over the years?

25          MR. LEONARD:  That requires an analysis of what the

1    claims were, Your Honor, with the circumstances under which

2    they paid.

3            THE COURT:  But under Fridena, the County fisc doesn't

4    have to pay any of it.  So if you are doing it out of the

5    goodness of your heart, maybe the supervisors need to get out

6    their checkbooks for unauthorized expenditure of county monies.

7            You know I'm being rhetorical here.

8            MR. LEONARD:  I understand.

9            THE COURT:  I'm trying to understand the boundaries of

10   what we're talking about.

11           Let me put another baseline consideration to you.

12   This discussion we have had, and thank you for engaging in it

13   with me.  When you step back from lawyers' quids and quibbles,

14   and you look at the proposition you are asserting here, it does

15   appear that what it boils down to is simply a rejection of the

16   Stone case, the Supreme Court's reversal of sovereign immunity

17   with respect to all these people in county government who are

18   final actors.  And if I'm charged with deciding whether this

19   Fridena line of cases is contrary to clear Arizona law, it does

20   appear to me that it is simply it is a de facto denial of

21   municipal liability, in violation of the Stone case and its

22   progeny that sovereign immunity no longer exists in Arizona,

23   because its practical effect is that there is no governmental

24   money available to pay for all these torts by all these --

25   everybody in the offices of all these county officers who are

1    directly elected other than the Board of Supervisors.

2          So I have a grave task here to say that this line of

3    cases is contrary to Arizona law.  But I have what appears to

4    me to be a stark contradiction of the Stone case and its

5    progeny that says, the government will pay for torts.  It is

6    liable for torts.  And yet I have this line of cases which just

7    came up less than 10 years after Stone came down, the Stone

8    case, you know, as you know, and you have briefed it, there are

9    other cases the Supreme Court has wrestled with the questions

10   of how do we mark the boundaries of things that are torts that

11   would have to be paid and things that are intrusion into

12   governmental discretion that for which we shouldn't have just

13   let a jury say, oh, I would have done that different, so it's

14   negligence or whatever.

15         It does look like this line of cases is a stark

16   contradiction of fundamental Arizona law that sovereign

17   immunity does not exist, and that the government and

18   municipalities are liable for at least the ordinary torts in

19   the course and scope.

20         MR. LEONARD:  But it isn't, Your Honor.  It isn't a

21   stark departure from that.  Because just as Your Honor points

22   out, that you have to draw a distinction -- and there's no

23   bright line distinction -- just as you have to draw a

24   distinction between the kinds of governmental -- the kinds of

25   torts for which the government, under Stone, should be and is

1    liable, you then have to say, as you pointed out, but this is

2    an intrusion into the governmental process.  This is an

3    intrusion into the discretion of governmental officials.  We

4    can't have juries second guessing that.  This is an analogous

5    kind of situation, Your Honor, where you have activities that

6    are committed to the discretion of constitutionally established

7    offices and elected officials who are charged with doing those

8    duties.  And the same principle applies.  I mean, the question

9    of whether juries should intrude, A, whether juries should

10   intrude into those kinds of activities and discretion, and

11   where you leave the County.

12          THE COURT:  See that's a different point altogether.

13   The point you are arguing now is that there are boundaries

14   between what's going to be compensable and what's not.  That's

15   different from what brings us here today, which is that the

16   County doesn't have to pay for torts in the Sheriff's office,

17   period.  That's a different proposition.  And that's, I mean,

18   it's really not in the motion that we came here to discuss

19   today.

20          MR. LEONARD:  I agree.  I agree.

21          THE COURT:  So I'm left with that great concern that

22   the practicality -- and in fairness to the Fridena court, that

23   case was decided, what, eight years after Stone came down, when

24   we were still in the formative period of flushing out what it

25   means not to have sovereign immunity.  And if we look to the --

1    the legislature has been active in this area since Stone.  They

2    have gone in, and a number of times they have restored some of

3    the immunities.  And the Supreme Court has upheld that as

4    against the abrogation clause.  They have come in and they have

5    marked boundaries that they think wise.  But one boundary they

6    have made clear in the statutes, that restores some immunities,

7    intentional torts are not exempted.  The intentional torts

8    remain.  They are specifically noted in some of the statutes as

9    we're not establishing immunities for those.

10          So what we have here is, I think, a background

11    fundamental shift in Arizona law in the Stone case that

12    involves sovereign immunity.  And then we have an evolution

13    through court cases and statutes to mark new boundaries that

14    leave -- there's no general immunity, but there are particular

15    immunities that have been established.  But conspicuously

16    remaining, even by the statute, is governmental liability for

17    the intentional torts of employees committed in the course and

18    scope.  So this brings me back to do I have an old decision

19    that, made in good faith before a lot of evolution of case law

20    and statutes, that now simply stands in contradiction.

21          MR. LEONARD:  I think what you have, Your Honor, is --

22    if you want to call a 40-year-old decision an old decision --

23    as you know, plaintiffs cited a 119-year-old Colorado Court of

24    Appeals case.  I would call that an old decision.  But if you

25    want to call a 40-year-old decision an old decision, then it is

```
 1   that.  It has been relied upon over the years in both the state

 2   and the federal courts.  It's been discussed in the federal

 3   courts.  And again, it has never, there has never been, as far

 4   as plaintiffs have cited or we have found, not the slightest

 5   suggestion in any case in this state or in the federal courts

 6   in this state, that it's wrong.

 7           THE COURT:  Well, this comes back to my comment

 8   earlier.  Part of that may be because the County is just paying

 9   off all the cases that would be a good test to put that back to

10   the Supreme Court.

11           MR. LEONARD:  I don't think so, Your Honor.

12           THE COURT:  Well, and I don't know.  I know they are

13   paying off lots of cases, because I see them in my court all

14   the time where they pay them.

15           Well, you can see that's my concern, that when one

16   tries to grasp the broader context and history here, this, I

17   would call an island, but it's a huge island, of restored

18   sovereign immunity.  It's the size of Australia.  The Sheriff's

19   office, County Attorney, and everybody in the County who works

20   for a directly elected official, that just -- and again, the

21   rationale of it consists of one paragraph.  And the substance

22   is nothing more than the Board of Supervisors can't control the

23   Sheriff.  Yes, they can't.  And that just has nothing to do

24   with whether -- it has everything to do with whether deputy

25   sheriffs are creating liability for the things they do.  But
```

 1    not with whether the Sheriff is creating liability to the

 2    County when the Sheriff or his deputies do things that are

 3    within the traditional notions of respondeat superior.

 4            This is the challenge that I have, and now you have

 5    it.

 6            MR. LEONARD:  But it's not -- again what I want to

 7    emphasize, Your Honor, is it's not it's not a 40-year history

 8    of unthinking reliance on Fridena.  It's, you know, I look at

 9    Judge Broomfield's decision.  I look at Judge Bury's decision.

10    I'm not saying they are binding on this court.  But there's

11    clear discussion in those decisions.  Citing not only Fridena,

12    but citing the subsequent Arizona cases, and citing the

13    Flanders case in the district of Arizona, reaching the same

14    conclusion.  If there were the slightest hint that any court

15    has thought -- and the fact that a superior court is bound to

16    follow Fridena, well, sure.  But the Court of Appeals is not

17    you know, if the Court of Appeals wants to say that we think

18    the decision 40 years ago was not correct, that they do that

19    all the time --

20            THE COURT:  Of course, we don't really know.  I think

21    I have read all of -- I might have missed something, but I

22    think I have read every Arizona Court of Appeals decision that

23    touches on this.  But I haven't read the briefs in all of them.

24    In fact, I have only read the briefs in Fridena itself.  So I

25    don't know how much of this is a systematic principled

1   re-inquiry into it, such as I'm trying to do now.

2         MR. LEONARD:  I guess my point, Your Honor, is that

3   whatever the size of the island is, whether it's small or big,

4   it is one that has been created over the past 40 years and has

5   not been -- the hurricanes have not diminished the size of the

6   island.

7         THE COURT:  Let me ask -- touch on some other sort of

8   practical points.

9         A decision here rejecting your motion will mean that

10  the County remains in the case and as this case goes to trial,

11  as to the state law claims, we'll instruct the jury

12  appropriately.  And it would, in effect, I mean, I haven't --

13  I'm just -- I have all this other mass of motions I'm dealing

14  with, so I'm not prejudging any of those.  But it means we

15  would get to the end of this case.  We would have a

16  determination, not just individual defendants are personally

17  liable and we can go after their checkbooks, but the County is

18  liable if the jury so concludes based on the instructions, that

19  I hope will be correct, that I give them.  Then a variety of

20  things could happen.  Some of these cases could drop out on

21  summary judgment.  The jury could reject them.  The County may

22  win.  The County may lose.  At that point, if anybody is

23  unhappy, you can take it up to the Court of Appeals and if you

24  want, you can ask them to certify this question to the Arizona

25  Supreme Court.

```
 1              But none of this will matter.  What I'm getting at is

 2      it does seem to be much more responsible judicial management

 3      for me to have this -- process this case in a way that allows

 4      anybody who is unhappy with whatever ruling I make to challenge

 5      it later.  But if I grant this motion and throw it out, I am

 6      then guaranteeing that if that's challenged and I'm reversed on

 7      appeal, or it's certified to the Arizona Supreme Court, I will

 8      have to have a second trial.  And I have, as in every case, I

 9      try to manage things in a way that reduces the risk of having

10      second trials, because they are so ruinously expensive to the

11      litigants.  So I'm sitting there thinking if there's doubt

12      here, it does make more sense to get the decision of the jury

13      as to whether the County has the liability under the facts and

14      under the law that I have instructed them on, and you all can

15      take it up later to undo it.

16              But what am I missing in terms of just the

17      practicality?  And also, I fully understand that it is very

18      important for the defendants to get out of cases when they are

19      entitled to because of the great expense of defending.  But on

20      the other hand, by virtue of its indemnification ordinance, the

21      County is richly involved in the defense of this case.  So if

22      we keep you here, Mr. Leonard, it's really not going to make

23      much difference in terms of the processing costs for the

24      County.  But we will have this set up to get definitive

25      decisions on appeal or on certifying questions to the Arizona
```

1    Supreme Court.

2            What am I missing in that analysis?

3            MR. LEONARD:  I think, Your Honor, the fact that,

4    look, one way or another, the County is going to be somehow in

5    the case through trial because we haven't moved for summary

6    judgment on all claims against the County.

7            THE COURT:  Well, that sort of strengthens my point.

8    We are only talking about the state law claims here.

9            MR. LEONARD:  Right.

10           THE COURT:  On the other hand, the practicality is, in

11   general, it's hard to get municipal liability under 1983.  In

12   general.  I'm not commenting on the specifics of this case.

13   Whereas, if the plaintiffs are right on the state law

14   liability, the county liability, the governmental liability

15   essentially just turns on whether they were in the course and

16   scope, which they pretty obviously were.  So the County

17   liability would be considerably easier to establish under state

18   law.  If you take as a given that the underlying torts are

19   proven, then it would be under federal law.

20           MR. LEONARD:  So here, I think, is the answer to your

21   question, Your Honor.  You ought to dispose of this claim

22   because even though the County may be in the case through trial

23   in any event, and I appreciate the comments the Court has made

24   about potential appeals and retrials.  But a claim that is

25   not -- that is not a properly founded claim under state law

1    ought to be disposed of, regardless of what it does to the

2    trial.

3              THE COURT:  Yeah, I know.

4              MR. LEONARD:  And I'm trying to think through to kind

5    of play out the various circumstances.  If the plaintiffs, if

6    this claim is disposed of and the plaintiffs think that

7    somehow, despite 40 years of history, case history in Arizona

8    in the district courts in Arizona, that all of that is wrong,

9    of course they are free to challenge that.  I don't know how

10   likely that is.  But clearly, if the -- if the claim is left

11   in, and I understand juries can do all sorts of things, if the

12   claim is left in, then presumably it's not going to be subject

13   to any kind of a trial motion by the County.

14             THE COURT:  No, you could make your motion for

15   directed verdict, like any case.

16             MR. LEONARD:  Sure.  But -- and who knows what the

17   jury will do.  And the jury may possibly reject that claim.

18   But if the jury doesn't, then it's a guaranteed appeal and

19   potential retrial.  So --

20             THE COURT:  Actually, no.

21             MR. LEONARD:  -- I don't see how it really plays out

22   predictably.

23             THE COURT:  It would only be a retrial if -- now I

24   can't imagine it would be a retrial.  The best you could have,

25   if you win on appeal, you could set aside the verdict and you

1    are done.  We would not have a retrial, I don't think.

2          Let me also give you comfort.  I never make a ruling I

3    believe is wrong just because I think it will be helpful for

4    case processing.

5          MR. LEONARD:  I appreciate that, Your Honor.

6          THE COURT:  The only time I do that is where the rules

7    expressly authorize it, and that is on motions for judgment as

8    a matter of law.  The rule says the Court can and, indeed, is

9    urged, if there's any question, to send the question to the

10   jury and reserve the motion.  And I have done that, where I

11   have let the jury decide.  And then I have granted the motion,

12   taken away the verdict.  The rules authorize me.  That's the

13   only time where I can think of where I knowingly made a ruling

14   I thought was -- I would have granted the directed verdict

15   instead of letting the jury decide it, and then I granted the

16   directed verdict.  So don't worry about me making a ruling that

17   is wrong just to process the case.

18         MR. LEONARD:  I have no doubt, Your Honor, never the

19   slightest belief that the Court's going to make a ruling it

20   believes is wrong just to serve the purposes of an efficient

21   trial.

22         THE COURT:  Let me throw out another practical thing

23   here.  I look at this and I have had another thought that --

24   and actually, it was helpful for you to attach the County's

25   indemnification policy.  And I see you have excluded from your

1    indemnification intentional acts and punitive damages, which is

2    common practice in insurance policies.  And frankly, I have no

3    reason to think that, even under state law principles I'm

4    grappling with, the County would be liable for a punitive

5    damage award made against the individual defendants.  I am not

6    suggesting that at all.  But it does appear to me that the

7    County would be liable under state law for intentional acts of

8    its employees and officers, even though your policy excludes

9    coverage for them, so that we may have a conflict of interest

10   lurking here.

11           Have you thought about that?  Conflict of interest

12   between the County and the individual defendants.  I mean, they

13   are all separately represented.  But --

14           MR. LEONARD:  Your Honor, they are all separately

15   represented.  I represent the interests of the County.  I do

16   not represent the County on coverage questions at all.

17           THE COURT:  This looks like it could be a classic

18   Damron issue where if the individual defendants are at risk of

19   a punitive damage award, and the County would not be liable for

20   that, no matter what, not under its indemnification and not

21   under general principles of state law, and the County controls

22   the defense, I guess it depends on whether there's a settlement

23   offer that the individual defendants demand be accepted.

24   There's nothing before me on that.

25           But I am -- I have wondered about this exclusion of

 1    intentional acts which, again, it appears that the statute is

 2    quite clear in partially restoring some immunities.  It did not

 3    restore immunity for intentional torts of employees.  So that

 4    the County could be liable under state law, but not liable

 5    under its indemnification for what actually may well be

 6    intentional acts.  I'm not prejudging those.

 7            MR. LEONARD:  Yeah, I guess I just don't categorize

 8    necessarily the indemnification as a liability.  I mean, it's

 9    like any other insurance policy.

10            THE COURT:  Right.

11            MR. LEONARD:  But I think your analysis is essentially

12    correct.  That could potentially be.  The County clearly would

13    not be liable for punitive damages under 1983.  Whether it is

14    under state law or not is certainly an issue.  And it is

15    clearly not covered, it appears, and again, I have never

16    even -- I don't think I have read the policy.  It's not my -- I

17    don't represent the County in connection with coverage.

18            THE COURT:  And to take that a step further, suppose I

19    granted your motion.

20            MR. LEONARD:  Yes.

21            THE COURT:  And the County were absolved from

22    liability on the state law claims, but the County is still

23    controlling the defense.  So the exact same bad faith situation

24    could arise, if there's a settlement that the individual

25    defendants demand be accepted, that would, in effect, force the

1    County either to pay or it would essentially be writing off the

2    limitations.  That's how the insurance law works.  This is all

3    complicated.  None of it is before me.  But my decision will be

4    based on this analysis.

5         Well, I didn't, I need to give -- is it going to be

6    Mr. Palys or Mr. Wulkan who is going to argue?

7         MR. LEONARD:  Before that, may I raise one other

8    point?

9         THE COURT:  You certainly may raise anything you want.

10        MR. LEONARD:  That came up in the response to our

11   motion, and that is the assertion that with respect to the

12   claim concerning the civil RICO action that was investigated

13   and brought, that that would not, regardless, that would not be

14   within the scope of the statutorily mandated duties of the

15   Sheriff or County Attorney.  And my point, I think we have

16   argued this in the reply, is fine.  If that's so, how can that

17   possibly be thought to be within this --

18        THE COURT:  Here's how.  Because under general

19   principles of respondeat superior, the superior is liable for

20   the acts when they put an employee in a position to do harm,

21   even if they violate -- don't you dare drive over the speed

22   limit.  They drive over the speed limit.  The employer is still

23   liable because they have put them in a position where they are

24   using the power and the authority of the principle and so

25   that's what respondeat superior means.

1        So, like if you are off duty and you are driving a

2   county vehicle and you go to the supermarket, that's different,

3   because that is not connected at all.  But respondeat superior

4   principles are not that narrow.  It is a broad principle that's

5   meant to allocate costs of injuries and other wrongs fairly to

6   enterprises in pursuit of which they are being done.  And when

7   an employee has power and authority and the ability to do harm,

8   and they do harm because of what's invested with them from the

9   employer, the employer doesn't get out by a narrow constricted

10  view of this course and scope of duty.

11       And one thing that is crystal clear here is that even

12  though the federal statutes didn't give the County Attorney any

13  special authority to bring a civil RICO action, he was clearly

14  acting -- the County Attorney was acting in his capacity as

15  attorney for county officers.  And the Sheriff was the

16  plaintiff.  And his complaint, as bizarre as it was, was

17  asserting rights and interests in his capacity as sheriff.  It

18  may have been crazy, but it was plainly within the course and

19  scope of, such that the wrongdoing by a person put in that

20  position is fairly charged to their principal, as opposed to

21  leaving the injured victim with no one to collect from.

22       Now, again, I'm not making any judgment about whether

23  individual defendants here don't have any resources.  But the

24  magnitude of this case is so great that it isn't -- no one can

25  assume that the individuals would have sufficient resources to

1   pay a judgment that was entirely plausible if all this succeeds

2   from the plaintiffs' point of view.

3            So anyway, that's my answer to this is it clearly in

4   the course and scope within how that tort concept is

5   understood, even though it didn't -- there was no express

6   authorization to bring the racketeering case by any statute.

7   There was a general authority to represent county officers.

8            MR. LEONARD:  I know Your Honor doesn't want to

9   belabor the point, but I would suggest that actually, the law

10  of respondeat superior as exemplified in both the Arizona cases

11  and the restatement is narrower than that.

12           THE COURT:  Well, you know.  So you're -- well, I want

13  to make sure I understand.  Are you -- actually, I really

14  didn't understand your motion as pressing that.  I thought your

15  motion was based on the Fridena idea of hey, we have a free

16  pass here.  We don't have to pay for anything on the Sheriff's

17  down line.

18           MR. LEONARD:  Well, it was, Your Honor, because this

19  point wasn't raised until the response.  So we addressed it in

20  the reply.

21           THE COURT:  Right.

22           MR. LEONARD:  The fact is, you have to have been

23  engaged.  If you commit torts while engaged in something you

24  were hired to do, that's one thing.  If you commit torts

25  engaged in something you were not hired to do, that's not

1    within the concept of vicarious liability.  And that's the

2    point we were trying to make.  They can't have it both ways.

3            THE COURT:  Yeah, all right.  Thank you.

4            MR. LEONARD:  Thank you, Your Honor.

5            THE COURT:  All right.  Mr. Palys, you do not get the

6    same amount of time.

7            MR. PALYS:  Do I get a very brief comfort break?

8            THE COURT:  Yes.  We'll take a 10-minute recess.

9            (Recess from 10:14 a.m. until 10:24 a.m.)

10           THE COURT:  Mr. Palys, please proceed.

11           MR. PALYS:  Thank you.

12           Part of the issue in the analysis and part of what

13   Your Honor has picked up on, both this time and the last time

14   we argued this issue two years ago, is the idea that County

15   government is divided.  And so there are certain people that

16   can't be controlled by others, but the County is nevertheless

17   liable for them.  I make the chart just to bear out that the

18   County, as we talk about it, is comprised of a few people.

19           THE COURT:  Of course, your chart is just wrong at the

20   very beginning, because you have the Sheriff and the County

21   Attorney below the Board of Supervisors, and you should have

22   them parallel.

23           MR. PALYS:  Either way.

24           THE COURT:  Go ahead.

25           MR. PALYS:  Under 11-401, the County is comprised of a

1    certain group of people, as Your Honor has picked up on, or

2    certain groups.  One is the Board of Supervisors.  Another is

3    the County Attorney.  Another is the Sheriff and some other

4    officers.  So picking up on something Mr. Leonard left off on,

5    he was making the analogy to Section 1983 law, under which he

6    said that there is no vicarious liability, as Monell shows.

7    However, municipalities are liable for the acts of their final

8    policy makers, when done in their official capacity.

9           THE COURT:  But we're not here to talk about Monell or

10   1983.

11          MR. PALYS:  Correct.  However --

12          THE COURT:  I don't mean to interrupt you, but I'm not

13   losing my focus on it.

14          MR. PALYS:  The point I need to make is under state

15   law, it is the same.  And that here you have a structure where

16   there is a final policy maker who is the County and who can act

17   in his official capacity.  And when he does so, it exposes the

18   County directly to liability for those acts.

19          Touching off from there, some more odd results follow

20   if you are to follow Fridena, especially when you go beyond the

21   county officers.  For example, the County claims that it is not

22   liable for essentially anyone other than a Board of Supervisors

23   employee, although it and the other officers make up the

24   County.

25          Here, though, the MCAO and MCSO are non-jural entities

1  that we can't sue because they are the County.  The County,

2  through those two departments, fired Lisa Aubuchon and David

3  Hendershott for the conduct underlying this case, thereby

4  exercising their control over those county employees.

5       THE COURT:  That was all after the -- after any

6  liability would have been incurred.

7       MR. PALYS:  I make the point that the County does, in

8  fact, have control because, among other things --

9       THE COURT:  I thought the new County Attorney is the

10  one who discharged Ms. Aubuchon.

11       MR. PALYS:  Following a county merit system hearing.

12       Your Honor noticed the tension between Fridena and the

13  later enacted -- well, the statute saying that liability is the

14  rule.  I did want to point out there's the seminal case on

15  that, Fidelity Security Life Insurance Company, which is a 1988

16  Arizona Supreme Court case, 954 P.2d 580.  It's discussing the

17  statutes I think you were referring to, A.R.S. 12-820, 820.01,

18  820.02.  Those statutes define what immunities exist.  As Your

19  Honor has also pointed out, that immunity doesn't exist for

20  these sort of torts that we are talking about.  So Fridena is

21  in conflict with those statutes, particularly because the

22  result of the County's argument is the only pot of money

23  available to satisfy any judgment against the Sheriff here is

24  the Sheriff's individual assets, which result in de facto

25  immunity for the County because it's never responsible for

1  those judgments.

2          A further practical problem then is no one could ever

3  be a county officer.  They would be constantly bankrupted by

4  the conduct of, you know, the regular torts, car accidents of

5  their line employees, if this is the logic we follow.

6          And last, before answering any questions the Court

7  has, another absurd example.  If a line deputy and a board

8  employee both go to a crime scene from their offices, they are

9  at the crime scene for County purposes.  They both drive back

10 to their offices and both get in car accidents on way back.

11 The rule the County wants you to announce under Fridena is the

12 County is liable for the negligence of its board employee but

13 not liable for the negligence -- identical negligence -- of the

14 sheriff's office employee.  There is no logic to that.

15          Unless the Court has questions, I have nothing more.

16          THE COURT:  Let me think for a minute.

17          There are a lot of these cases that follow on Fridena

18 as cited.  But are there any of them, and I don't -- like I

19 said, I had at one point thought I had read all of them.  Are

20 there any of them that provide any more elaborated rationale

21 beyond the summary assertion in Fridena that I have restated

22 here?

23          MR. PALYS:  Not that I'm aware of, and certainly I

24 have never seen one that harmonizes Fridena with 12-820,

25 820.01, 820.02.

```
1          THE COURT:  Of course it couldn't, because that
2     statute was enacted long after Fridena was decided.
3          MR. PALYS:  But that's part of the point of why
4     Fridena can't stand.  Because those statutes carve out narrow
5     instances where the County is not liable.  A telling example,
6     12-820.02(a)(1), a decision not to arrest someone, the county
7     is not liable for it.  Well, what's the converse of that, to
8     arrest someone not excluded could be liable for it.  But here
9     the County says, no, because that's the Sheriff.  It gets
10    absurd because, of course, the board employee is not ever going
11    to be arresting someone.  Who is the County liable for in that
12    circumstance?
13         THE COURT:  You know, I'm not sure where this goes,
14    but I have the County's reservation of rights letter that they
15    sent to all the defendants.  I guess this is sort of what I
16    said earlier when I was talking to Mr. Leonard, that it does
17    seem a benefit of me giving my best ruling on this is that if
18    my view of this is correct, the County's liability by law to
19    the plaintiffs exceeds its indemnification that is given to its
20    employees.
21         Now, as a practical matter, plaintiffs are in it for
22    the money.  And if you find one pot of green money that's easy
23    to get, you get your money there and it's paid.  And that's why
24    the employees don't worry about these things, because the
25    County, if the County is liable, that's where the money will be
```

1  paid.

2         I have never heard of anybody electing to execute

3  against the employee on a joint municipal and employee

4  liability when they have easy money to get from the County.  So

5  even though it may not technically be an indemnification, as a

6  practical matter, it protects the employee by providing a more

7  ready pot of money to pay for the same damage.

8         No.  I don't have any other questions.

9         MR. PALYS:  Thank you.

10        THE COURT:  Any brief reply, Mr. Leonard.

11        MR. LEONARD:  Extremely brief, Your Honor.

12        The only thing I want to point out, again this is sort

13  of along the lines of my arguing earlier that in 40 years,

14  nobody has been able to cite to a case that has suggested that

15  Fridena is wrong.  But I do want to mention to the Court

16  another Arizona case, 2008 Court of Appeals case, the Hounshell

17  case.  H-O-U-N-S-H-E-L-L, at 220 Arizona 1, which is another of

18  these cases where Apache County there had suspended a county

19  sheriff commander without pay based on certain allegations.  He

20  challenged the suspension.  The Court of Appeals held that

21  because our legislature has not expressly granted a County

22  Board of Supervisors the power to discipline the classified

23  employees or other county officers, we may not and do not find

24  such authority by implication.  The only point in my raising

25  that, Your Honor, is it is just further, in my view,

1   confirmation of the fact that Arizona courts have pretty

2   consistently recognized the limitations of the authority of the

3   Board of Supervisors.  That's all I have.

4          THE COURT:  All right.  I think I do recall that case.

5          MR. PALYS:  Judge, if I may, I would like to be heard

6   on that case as well.

7          THE COURT:  You may.

8          MR. PALYS:  If I could, I have a copy here with me.  I

9   would like to approach and give it to the Court.

10          THE COURT:  All right.

11          MR. PALYS:  The reason I was thinking about this case

12   is I thought how helpful it is for us in that, number one, it's

13   talking about, in paragraph one, the supervisors acting in

14   their official capacity, bearing out the analogy we have been

15   making to 1983 law, where people can indeed act in their

16   official capacity.  Second, it touches on an issue the Court

17   has not reached yet, which is the Board of Supervisors' ability

18   to control the Sheriff, which on my chart is the reason I had

19   the Board of Supervisors actually above the County Attorney and

20   the Sheriff.  This touches on further under Fridena.

21          The Board of Supervisors does, in fact, have the power

22   to supervise, as the name suggests.  It supervises two

23   categories of people:  One, all county officers, such as the

24   County Attorney and the Sheriff; and two, officers of other

25   districts meeting certain conditions.  The Hounshell case talks

1    about the manner in which the Board of Supervisors can

2    supervise those officers.

3          A board has three options.  One, it can force any

4    officer to report under oath to it.  Two, it can force that

5    officer to post bonds or further bonds to protect the public.

6    And three, if the officer fails to do so, it can remove the

7    officer and put someone of its choosing who will follow its

8    directions, which is what was at issue in Hounshell.

9          Notably there, the board was requiring Hounshell to

10   put up his individual assets as security for the bond.

11         The point I make with that is here the board had the

12   ability to control Sheriff Arpaio on these facts.  Had it been

13   concerned about his actions, it could have asked him to report

14   under oath to it.  Had it not liked what it heard or thought

15   Sheriff Arpaio was exposing it to massive liability, it could

16   have required him to post a bond or further bond.  Had Sheriff

17   Arpaio refused to do either one of those two things, it could

18   have removed him and put in someone who would.  So the

19   Hounshell case further bears out that the board does indeed

20   control its officers.

21         THE COURT:  All right.  Yeah, I recall this case.

22         Did you want to say something further?  You may.

23         MR. LEONARD:  Well, I did, Your Honor, because I mean

24   it sort of opens up an area that the Court hadn't really gotten

25   into.  And it's just so wrong.  This section of 11-251 that Mr.

1    Palys has put up, he's rewritten it by these red markings, by

2    the editing.  It's clear, again, there is just an entire lack

3    of case law being cited here.  There is no case that they have

4    cited or that we have found that reads this statute the way.

5          THE COURT:  Well, I'm having a hard time seeing how

6    this case matters.

7          MR. LEONARD:  No.  I'm sorry.  I'm not talking about

8    Hounshell, I'm talking about the statute.

9          THE COURT:  Oh.  All right.

10         MR. LEONARD:  They have just rewritten the statute.

11   The Board of Supervisors may, they say, one, supervise the

12   conduct of, in effect, the Sheriff; and then two, may supervise

13   the conduct of officers of all districts and other subdivisions

14   of the county charged with assessing, collecting, safe keeping,

15   managing, or disbursing the public revenues.  They, in effect

16   by their editing, inserted punctuation which is not there.

17   That's not what the statute says.  It's one sentence.  It says,

18   may supervise the official conduct of all county officers and

19   officers of all district and other subdivisions.  In other

20   words, county officers and officers of all districts and other

21   subdivisions charged with assessing, collecting, safe keeping,

22   managing, or disbursing the public revenues.  It's not two

23   separate sections.  It's one.  It's one sentence without

24   punctuation.  And they have just rewritten it.

25            And the idea that they have argued this before, we

1    addressed in our papers.  The idea that the Board of

2    Supervisors may require a county officer to make reports, and

3    if he fails to do so, may be removed from office, that's a very

4    specific -- the cases are so clear on this.  The board has the

5    powers it's given.  It's a very specific power.  It doesn't

6    give them the authority to decide they don't like what he's

7    doing and to fire him.  He's a constitutionally elected

8    official.

9         So my principal objection, Your Honor, is they have

10   just rewritten 11-251.

11        THE COURT:  All right.  Thank you.  I don't think this

12   Hounshell case matters, because even taking the County's case

13   more strongly, I still have to confront these basic questions.

14        This is a question that merits a substantial written

15   disposition.  And I intend to do that.  However, because of the

16   circumstance we're in, with, how many, eight more motions for

17   summary judgment pending and the need to have a firm trial date

18   that's the only time I can do this, I simply -- I don't have

19   the time to do the thorough written exposition that this merits

20   at this time.  So I am going to give an oral ruling now with

21   opinion to follow.  I almost never do that.

22        The parties need to have a ruling now and can't wait.

23   And I will tell you, I think you know this, previously our

24   court here, Phoenix division of our court, had one of the

25   highest caseloads per judge of all federal courts in the

1    country.  We now have four vacancies out of eight, and the four

2    of us, we're doing -- we now have double the amount of work we

3    had before, and before we had one of the highest caseloads in

4    the country.  It is not humanly possible to do everything that

5    I want to do.

6         So I am compelled to focus on making the right

7    decision.  And to some extent, I have to forego more thorough

8    exposition that I ordinarily would do.

9         I do intend to do that in this case, so I'm going to

10   deny the motion.  There's no practical prejudice to the

11   defendant in me giving this oral ruling with an opinion to

12   follow, because this ruling will not be an appealable order.

13   So I will have the opportunity before this case is concluded to

14   favor you all with my best written exposition of my ruling and

15   the reasons for it.

16        But I will state generally, I do conclude that the

17   Fridena line of cases is clearly contrary to Arizona law, as we

18   have established in this discussion.  Respondeat superior is

19   relevant for defining the scope of that conduct for which the

20   employer or the County should be accountable.  I believe the

21   Fridena line of cases clearly errs when it holds that ability

22   to control is a measure of county liability for the actions of

23   the Sheriff or any other county officer.  Ability to control

24   really has nothing to do with liability.  The Sheriff is the

25   County.  He is the final actor.  It is simply not logical,

1    doesn't serve any purpose, to say that the County escapes its

2    liability because any one of it final actors cannot be

3    controlled by any of its other final actors.  So I'm satisfied

4    that is clearly contrary to Arizona law.

5         Moreover, as I have suggested earlier, that case, in

6    fairness, the briefing was perfunctory.  The conclusion was

7    stated without explication, and it came just in the early times

8    of the development of Arizona law after the abrogation of

9    sovereign immunity.  So it's understandable that a lot of

10   things were on the plate that could be -- were done that could

11   be different from what evolved later.  The Arizona cases set

12   boundaries for what government actors are liable for that have

13   to do not with ordinary intentional torts or negligent torts.

14   Those boundaries simply don't come into play here.  The State

15   tort action here are essentially all intentional torts, alleged

16   intentional torts.  They are within the course and scope in

17   that they were all committed because of the opportunity,

18   ability, and power entrusted the defendants because of their

19   employment or their office.  And the Fridena rationale would

20   cause a massive restoration of sovereign immunity that is

21   directly contrary to the fabric of Arizona law as developed by

22   the Supreme Court.  And indeed, there is affirmation of that in

23   the legislature's restoration partial restoration of immunities

24   that initially, in some respects -- well, they don't restore

25   immunities for intentional torts.  In some respects, they

1    specifically mention torts, intentional torts, as not being

2    affected.

3         So I think for processing this case, it may well be

4    helpful for all the parties, especially the County, to know

5    that that's my ruling.  And I do think that means that the

6    County will be liable for intentional torts, even if it has

7    excluded indemnification, these intentional -- I don't have to

8    say more broadly -- these intentional torts, committed in the

9    course and scope.  And I tell you that because that is the

10   clear substance of my conclusion.  And I just believe in giving

11   litigants the amount of -- as much guidance as I can.  So to

12   me, that would render moot the reservation of rights letter,

13   with respect to intentional torts.

14        I don't -- as I said before, I don't have any reason

15   to think that the County would have any liability for punitive

16   damage awards made against the individual defendants.  So those

17   would stand as risks of the individual defendants.

18        So, all right.  It is therefore ordered that for the

19   reasons stated in the open record, in open court, that Maricopa

20   County's Motion For Partial Summary Judgment, Document Number

21   1058, is denied.  The Court will issue a written decision

22   later.

23        Now, I have got all these other motions.  I didn't set

24   them for discussion now.  I might -- I might set some of that

25   for oral argument, simply because there's so many of them.  And

| | |
|---|---|
| 1 | if I -- I will contact counsel.  My -- let's see.  In fact, |
| 2 | right now my intention is to do that with -- I think I had the |
| 3 | final pretrial statement due in mid-December.  Was it December |
| 4 | 13? |
| 5 | MR. PALYS:  I think it was the 16th. |
| 6 | THE COURT:  16th is a Monday.  Anyway it's around |
| 7 | then. |
| 8 | MR. WULKAN:  The final pretrial statement is -- I |
| 9 | think the conference is December 7th. |
| 10 | THE COURTROOM DEPUTY:  December 6th, Judge. |
| 11 | THE COURT:  December 6.  And when do I have you, I |
| 12 | think I had the intermediate date -- well, is that the time for |
| 13 | -- when do I have you exchanging your drafts of pretrial |
| 14 | statements? |
| 15 | MR. WULKAN:  I'm sorry, the order is due on the 6th. |
| 16 | THE COURT:  That means you all have to have worked |
| 17 | before then. |
| 18 | MR. WULKAN:  Right. |
| 19 | THE COURT:  Which means I have to give you a ruling. |
| 20 | I will tell you, what my goal was to have a ruling by |
| 21 | the end of next week, which would leave you a few weeks to work |
| 22 | out a pretrial statement.  And the sheer volume of these |
| 23 | motions is crushing.  And the other problem I have is I have a |
| 24 | three-week bench trial starting next Tuesday. |
| 25 | Nick, how is my calendar on Monday? |

1          THE COURTROOM DEPUTY:  This coming Monday?

2          THE COURT:  Yeah.  Monday is the day I handle criminal

3     sentencings and other criminal matters, and sometimes the day

4     is overwhelmed.  Sometimes less so.

5          THE COURTROOM DEPUTY:  You don't have anything in the

6     morning.  You have a couple things in the afternoon, not much

7     actually on Monday.

8          THE COURT:  Well, I'll tell you what.  Then I could

9     set an oral argument on Monday morning.  I know we have a lot

10    of counsel on the phone, but maybe not everybody.  So we'll

11    send out an e-mail to everyone asking you to confer as to

12    whether you all would be available.  With respect to that,

13    because there's so many, it's my usual practice to -- I don't

14    set many oral arguments.  But when I do, I give people plenty

15    of time.  I'm going to have to set time limits on that.

16    There's just way too many.

17          So we'll communicate with you all by e-mail.

18    Actually, what I'm going to ask you all to do is communicate

19    with each other as to whether you all can have an oral argument

20    on that on this Monday morning.  We can do it pretty much any

21    time that morning.  You know, 9:00, 10:00.  When are my

22    sentencings done in the afternoon?

23          THE COURTROOM DEPUTY:  Should be done around 2:30.

24          THE COURT:  We could also do it at like 3:00 Monday

25    afternoon.  So my main concern is times that counsel are

1    available.  My purpose for that oral argument is somewhat

2    different from my purpose -- this oral argument, my purpose is

3    to have this pretty extensive dialogue with you all.  That one,

4    my purpose is to give you all the chance to say what you have

5    to say because those are very important motions.  But I don't

6    have as many questions for you.

7         So you all don't have to deal with it now.  I want you

8    all to confer and let me know whether you all can make an oral

9    argument either on Monday morning or Monday afternoon at 3:00

10   or later.

11        MR. WULKAN:  Your Honor, I'm not sure it makes a

12   difference, but you did make a comment last time that you had

13   wished you had known if it was --

14        THE COURT:  I'm sorry.  Speak into microphone.

15        MR. WULKAN:  I'm sorry, Your Honor.  Either the last

16   hearing or the hearing before, you make a comment that you

17   wished you knew whether the Wolfswinkels were going to settle

18   the case the week before.

19        THE COURT:  Well, I wasn't complaining.  I know things

20   move as fast as they can.

21        MR. WULKAN:  I just want it on your radar screen.  We

22   are intending to participate in a mediation on the 6th.  That's

23   two days after the oral argument.  I don't know if that factors

24   into your consideration or not.

25        THE COURT:  Well, it does in that I know that cases

1    are easier to settle when the range of unknowns are narrowed.

2    And therefore, to the extent I can give you rulings, I assume

3    that would just help you possibly bringing the rest of your

4    gap.  So I would like to be able to do that.

5           So what day is that, the 6th?  Wednesday.

6           MR. WULKAN:  Oh, wait a minute.  I may have gotten

7    that wrong.  No.  It's the it's the 6th, the Wednesday.

8           THE COURT:  So the real -- well, actually, you know,

9    that is so close that I'm not -- frankly, if I thought it would

10   help your prospect of settling to rule on as much as is

11   possible, I would make every effort to do it.  But sometimes it

12   doesn't work that way.  Sometimes it's better not to rule.  And

13   I have no idea.

14          MR. WULKAN:  I just wanted to put that on your radar

15   screen so you had all of the information.

16          THE COURT:  Thank you for telling me that.  I just --

17   you know, the truth is, I think it's not humanly possible for

18   me to try to have a ruling in advance of that.  There's just so

19   much here.

20          Are you suggesting there is some -- well, I don't

21   know, maybe you would.  No.  I better not ask you that.

22          MR. WULKAN:  I'm not making any suggestions, Your

23   Honor.

24          THE COURT:  Okay.  All right.  Very well then.  Get

25   back to me.  E-mail to my secretary about whether you all can

1    make oral argument on either that Monday morning or Tuesday.

2    The problem is I'm starting this bench trial on Tuesday that --

3    it's a construction case involving 112 claims.  And I don't get

4    extra pay for that.  So I'd like to have this as far along as

5    possible before I start that trial.

6              All right.  Thank you.  We'll be adjourned.

7              (Proceeding concluded at 10:54 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1

2

3

4

5                        C E R T I F I C A T E

6

7           I, LAURIE A. ADAMS, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 14th day of November,

16    2013.

17

18                              s/Laurie A. Adams
                                _____
19                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25