ALLISTER ADEL
MARICOPA COUNTY ATTORNEY

By: CHARLES E. TRULLINGER (018936)
SHERLE R. FLAGGMAN (019079)
Deputy County Attorneys
trullinc@mcao.maricopa.gov
flaggmas@mcao.maricopa.gov

CIVIL SERVICES DIVISION
225 West Madison Street
Phoenix, Arizona 85003
Telephone (602) 506-3411
Facsimile (602) 506-4317
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

Attorneys for Defendants Sheriff Penzone, Leatham, Kelleher, & Asiedu.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Lisa Yearick,<br><br>Plaintiff,<br><br>v.<br><br>County of Maricopa, at al.,<br><br>Defendants. | **NO. CV 20-0545-PHX-SPL**<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On December 16, 2018, MCSO officers responded to a 911 call for help that had been placed by a woman whose husband was brandishing a weapon in their home. When the officers arrived, they were confronted by the man, who was armed with a .357 revolver. Despite their orders for the man to drop his gun and surrender, the man refused and

continued to walk toward the officers with the gun in his hand. Fearing for their lives, the officers shot the man.

Because there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56, they hereby move for summary judgment of Plaintiffs' Third Amended Complaint ("TAC") (Doc. 31).[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

From the evening of December 15 to the morning of December 16, 2018, Edward Rudhman ("Rudhman") and his wife, Lisa Yearick ("Yearick") stayed up all night while Rudhman became intoxicated. (SOF ¶¶ 14, 17). Rudhman's drinking—his first consumption of alcohol in more than a year (SOF ¶ 1)—was triggered by a series of unfortunate events that had recently befallen him: He had been terminated from his job after more than 20 years (SOF ¶ 2); his mother, Leigha Huber ("Huber"), who owned the house Rudhman and Yearick lived in, was going to sell it imminently because of financial and litigation problems (SOF ¶¶ 3-5); and, after devising a plan to move out of the house and go to Pennsylvania, and discussing the plan with Huber, Huber hung up the phone on him (SOF ¶¶ 6-9). Huber's act triggered the all-night drinking episode. (SOF ¶¶ 10-13).

The following morning, December 16, 2018, Rudhman began wrecking the house and saying things like "This isn't our house. Let . . . fucking deal with it." (SOF ¶¶ 14-16). Yearick become so frightened that she called 911 for help. She reported that her "husband is threatening to kill himself" and that "he's gonna kill his animals" and reporting that "he's

[1] A Certificate of Conferral is attached hereto as Exhibit A, pursuant to Doc. 38.

been drinking "all night." (SOF ¶ 17). While on the call with the 911 dispatcher, approximately six gunshots were heard, Yearick screamed and said, "I'm afraid to go out of this room." (SOF ¶ 18). Rudhman came to her door twice while Yearick was on the 911 call. Rudhman broke down the bedroom door the first time and, when requested, refused to give Yearick the gun. Rudhman left the bedroom and Yearick relocked the door. (SOF ¶¶ 19-20). Yearick told the 911 dispatcher that she couldn't leave the house because Rudhman was outside. (SOF ¶ 23). Rudhman came back to Yearick's bedroom door a second time. This time he offered to give her the loaded .357 if she used it to shoot him. Yearick refused to open the door. That is when she heard MCSO public address announcements. (SOF ¶¶ 24-25).

Upon their arrival, the deputies staged along the street a few houses away and then walked to the Rudhman house to prepare for the encounter, determine the correct house and where Rudhman was located within the house, determine the layout and cover options, and take positions around the front portion of the house (SOF ¶¶ 22; 28–31). In addition to Yearick being present, there was a family of four living in an R.V./bus on the property and a neighbor who was outside; both heard Rudhman firing his gun and took cover. (SOF ¶¶ 32-33). The deputies' body worn cameras recorded what happened next. (SOF ¶ 27). Sergeant Leatham made five announcements over his patrol unit public address ("P.A.") system, identifying themselves with the Maricopa County Sheriff's Office, telling Rudhman they don't want him to get hurt, and ordering him to come out of the residence *without* the gun. During the fifth announcement Deputy Normile exclaimed that Rudhman was coming out of the front door. (SOF ¶¶ 34-35). All the deputies saw that Rudhman had a large silver

revolver in his right hand. He turned into the driveway and began walking towards the deputies. Sergeant Leatham gave Rudhman five non-amplified commands to "drop the gun" and "stop where you are." (SOF ¶¶ 36-37). Rudhman refused every command and continued walking toward the deputies, saying, "I can't do that . . . no I'm not stopping right there" and "That's not going to happen" or "That's not gonna happen." (SOF ¶¶ 38-42). Rudhman raised the gun and began to swing it erratically while he was walking toward the deputies. (SOF ¶¶ 39-41).

Despite carrying a loaded gun and refusing to obey their commands, the deputies permitted Rudhman to walk toward them for twenty-four seconds, during which time he walked forty feet closer, cutting the separation distance nearly in half, before they fired. The four deputies who fired did so because Rudhman had become an immediate deadly threat and they fired at nearly the same time. Only Deputy Brennan, who was behind Deputy Normile, did not fire. (SOF ¶¶ 43-45).

Sergeant Leatham immediately called for the fire department to respond. They then approached Rudhman and found that his .357 magnum revolver was fully loaded and cocked. (SOF ¶¶ 46-47).

## II. LEGAL STANDARD FOR RULE 56 SUMMARY JUDGMENT MOTIONS

"[I]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment must be granted. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes

demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. If the moving party meets this initial burden, the burden is shifted to the opposing party, who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III. ANALYSIS

Plaintiffs filed a Third Amended Complaint ("TAC") on 9/8/20 (Doc. 31) and it is the operative complaint.

### A. Summary Judgment should be granted as to Count One because there is no genuine issue of material fact regarding the claim of excessive force alleged by Rudhman's estate.

Determining whether a particular use of force was reasonable requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). It has long been recognized that making an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat" to carry out the stop. *Graham,* 490 U.S. at 396. "The 'Reasonableness' of a particular use of force must therefore be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Id*. Thus, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id*. (internal citation omitted). Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

The reasonableness inquiry must be evaluated objectively, meaning without regard to the officer's underlying intent or motivation. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

With these principles in mind, the Courts have developed a set of three core reasonableness factors to consider, which requires careful attention to the facts and circumstances of each case: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. The three core factors are not exclusive and other factors may be relevant in some cases. For example, another recognized factor relevant in the present case is that the police were responding to a domestic disturbance call. "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (citing *United States v. Martinez*, 406

F.3d 1160, 1164 (9th Cir. 2005).

A motion for summary judgment cannot be defeated just because an opposing expert opines that "an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. Rather, the court must decide as a matter of law 'whether a reasonable officer could have believed that his conduct was justified.' *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014) (citing *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002), *abrogated on other grounds by Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 198 L. Ed. 2d 52 (2017).

**1. Rudhman posed an immediate deadly threat or a threat of serious physical harm to the safety of the officers and others.**

Defendants' analysis begins with the most important reasonableness factor first. "When evaluating the government's interest, the most important factor is whether the person posed an immediate threat to the safety of the officer or another. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 998 (9th Cir. 2020), *cert. denied sub nom. Acosta v. Lam*, 142 S. Ct. 77, 211 L. Ed. 2d 14 (2021); *Accord, Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014) (same); *Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017) (same); and *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (same). It is not constitutionally unreasonable to use deadly force to apprehend a suspect when an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others. *Wilkinson v. Torres*, 610 F.3d. 546, 550 (9th Cir. 2010).

Here, there is no doubt that a reasonable officer would believe Rudhman posed an immediate threat of deadly harm or serious physical harm to the safety of the officers, the family in the R.V., or the neighbor who was outside. The deputies knew that Rudhman had

threatened to kill his animals before they arrived on scene. (SOF ¶ 17), and that he had fired at least six shots from his revolver somewhere in the back yard. (SOF ¶ 18). After the deputies arrived and called for Rudhman to exit the house *without* the gun, he instead came out of the house carrying the gun, turned into the driveway, and began walking toward the deputies. (SOF ¶¶ 34-36). He failed to obey at least five separate commands to stop walking toward them and/or to drop the gun. (SOF ¶¶ 37-38). In defiance of their commands, Rudhman said, "I can't do that . . . no I'm not stopping right there" and "That's not going to happen." (SOF ¶¶ 39, 40-42). Rudhman's refusal to obey commands endangered not only the officers, but the family in the R.V. and a neighbor who was outside. (SOF ¶¶ 32- 33). Plaintiffs' police practices' expert, Burwell, was not critical of calling Rudhman out of the house. (SOF ¶ 52). And Burwell agrees that Rudhman failed to follow the deputies' commands, walked toward the deputies with a gun in his hand (presumably loaded), and told the officers he was not going to stop. (SOF ¶¶ 48-51).

"When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Accord*, *Pottorff v. City of Fresno*, No. 116CV01593DADSKO, 2020 WL 4437606, at *8 (E.D. Cal. Aug. 3, 2020) ("Pointing a gun at police officers justifies the use of deadly force.") Plaintiffs will no doubt argue that so long as Rudhman didn't point his gun at the deputies, use of deadly force was unconstitutional. Even if the Court assumes Rudhman held the revolver at his side as he walked toward the deputies, that fact alone is insufficient to transform Rudman's actions from a suspect who posed an

immediate threat to a suspect who did not.[2]

The Constitution does not require a suspect to point his weapon at the officer for the suspect's actions to constitute an immediate deadly threat or a threat of serious physical harm. Nor does an officer need to wait to be shot at before he can defend himself with deadly force. *George*, 736 F.3d at 838 ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Similarly, "'the Fourth Amendment does not require omniscience,' and absolute certainty of harm need not precede an act of self-protection." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) (finding that a reasonable officer had probable cause to believe decedent's actions in accelerating a minivan around the officers in a slippery yard while failing to yield to sirens and direct commands to stop the vehicle justified the use of deadly force.).

Nor are officers required to start with non-lethal force. Because police encounters often arise in circumstances that are tense, uncertain, and rapidly evolving, police are permitted to use more force than may have been necessary, so long as their actions were reasonable. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz, 533 U.S. 194, 195, 121 S. Ct. 2151, 2153, 150 L. Ed. 2d 272*

---

[2] Defendants recognize it is disputed whether Rudhman pointed his gun at the deputies. Defendants submit that this disputed fact is not material because even if the Court assumes Rudhman did not point his gun at the deputies, for purposes of this motion only, he still posed an immediate deadly threat or a threat of serious physical harm.

*(2001), overruled on other grounds in Pearson v. Callahan, 555 U.S. 223 (2009).* "A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).

**2. The severity of the crime at issue.**

Based on the facts of this case, at a minimum, the deputies had probable cause to believe that Rudhman was guilty of domestic violence, as proscribed in A.R.S. §13-3601(A)(1), which prohibits any act referenced in several enumerated Title Thirteen sections that occur while the victim and the defendant are married or living in the same household. In the present case, the applicable offenses that make up the domestic violence crime include the following: (1) Disorderly conduct, in violation of A.R.S. §13-2904(A)(1, 2, and/or 6). Disorderly conduct under subsection A, paragraph 6 is a class 6 felony. Disorderly conduct under subsection A, paragraph 1 or 2 is a class 1 misdemeanor. A.R.S. §13-2904(B); (2) Endangerment, in violation of A.R.S. §13-1201(A). "Endangerment involving a substantial risk of imminent death is a class 6 felony. In all other cases, it is a class 1 misdemeanor." A.R.S. §13-1201(B); (3) Threatening or intimidating, in violation of A.R.S. §13-1202(A)(1). This is a class 1 misdemeanor. A.R.S. §13-1202(B); and/or (4) Assault, in violation of A.R.S. §13-1203(A)(2). Assault pursuant to subsection (A)(2) is a class 2 misdemeanor. A.R.S. §13-1203(B).[3] (SOF ¶ 54).

Separate and apart from the danger to Yearick, the residents of the R.V. and the

[3] The same charges would all apply vis à vis the victims in the R.V. and the neighbor, though without the domestic violence component.

neighbor, it was unknown whether Rudhman shot a dog, was shooting at something else, or was shooting into the air prior to the deputies' arrival. "A person who with criminal negligence discharges a firearm within or into the limits of any municipality is guilty of a class 6 felony." A.R.S. §13-3107(A) (a/k/a *Shannon's Law*). Thus, Defendants had probable cause to believe that Rudhman had criminally discharged a firearm from his backyard. (SOF ¶ 54).

**3. Whether Rudhman was actively resisting arrest or attempting to evade arrest by flight.**

Rudhman was resisting arrest as proscribed by A.R.S. §13-2508(A)(1) or (2). Walking toward the deputies with a loaded gun, refusing to drop it, refusing to stop walking toward them, and then declaring "I can't do that . . . no I'm not stopping right there" and/or "that's not going to happen" manifested his clear intention to resist the deputies' efforts to arrest him. (SOF ¶ 54). It has long been recognized that making an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat" to carry out the stop. *Graham*, 490 U.S. at 396.

In sum, the undisputed facts and totality of the circumstances of the case at bar justified Defendants' use of deadly force and Rudhman's Fourth Amendment rights were therefore not violated.

**B. Qualified Immunity applies.**

Even if the Court finds that the Defendants violated Rudhman's Fourth Amendment rights, the violation was not clearly established at the time of the incident and the Defendants are therefore entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotation marks omitted). The purpose of the doctrine is to balance two important interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. (internal quotation marks omitted). Qualified immunity protects public officers from mere mistakes in judgment, whether the error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Id*. (citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

The two-part analysis requires the Court to determine "whether the facts show that (1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation." *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010). If the officer did not violate a constitutional right, they are entitled to immunity.[4] If the officers did violate a constitution right, but that right was not clearly established at the time of the encounter, they are entitled to immunity. *Id*. This two-part analysis can be done in any order and may be dependent on the developed facts or on the law that existed at the time of the event. *Pearson v. Callahan*, 555 U.S. 223 at 239 (overruling the mandatory two-step sequence for resolving qualified immunity

[4] This first prong of the qualified immunity analysis, whether the Defendants violated Rudhman's Fourth Amendment Rights, was discussed in Section "III(A)" above. Defendants maintain that there was no violation of Rudhman's Fourth Amendment Rights.

claims set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The analysis must be "from the perspective of a reasonable officer on the scene and allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Longoria v. Pinal Cty.,* 873 F.3d 699, 704 (9th Cir. 2017) (internal quotation marks omitted) (citing *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

**1. Defendants did not Violate Clearly Established Law**

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8, 211 L. Ed. 2d 164 (2021) (internal quotation marks and citation omitted). The U.S. Supreme Court has emphasized that specificity is important, especially in the Fourth Amendment context where it may be difficult for an officer to determine whether relevant legal doctrine applies to a given set of facts. *Id*. "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case that their particular conduct was unlawful." Sharp v. Cnty. of Orange,* 871 F.3d 901, 911 (9th Cir. 2017) (emphasis original). See also *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (criticizing the Ninth Circuit Court of Appeals for acknowledging that qualified immunity must be undertaken in the specific context of the case "but then proceeding to find fair warning in the general tests set

out in *Graham* and *Garner*.").

Here, the deputies did not violate clearly established law. There are no cases holding that it is a constitutional violation for officers to shoot a subject when that subject (a) had scared his wife enough that she locked herself inside her bedroom and called 911; (b) had a large-caliber revolver; (c) threatened to shoot the family dogs; (d) fired the gun in the backyard; (e) refused deputy commands to come out of the house *without* the gun; (f) refused at least five additional deputy commands to stop and/or drop the gun; (g) walked directly toward the deputies while carrying the loaded handgun; and (h) said "I can't do that . . . no I'm not stopping right there" and/or "that's not going to happen" in response to deputy commands. And recall that the wife was unable to get out of the house. (SOF ¶ 23).

**2. There are no cases that would have made it clear to a reasonable officer that it was a Fourth Amendment violation to shoot the decedent given the facts of this encounter.**

*Lal v. California*, 746 F.3d 1112 (9th Cir. 2014) is a comparable case to the present facts. Kamal Lal ("Lal") was upset over a domestic disturbance with his wife. His wife called 911. While the dispatcher was still on the phone with her, Lal drove away in his pickup truck. California Highway Patrol pursued him for approximately 45 minutes. During a call to his cell phone, Lal told police that he wanted to kill himself or have the police shoot him. Eventually the chase ended. Lal got out of his car, and in addition to hitting himself with a big rock, he threw several softball sized rocks at the officers, all of which missed them. At one point he picked up a large rock about the size of a football over his head and advanced at an irregular pace toward the officers. The officers warned him that they would have to shoot him if he didn't drop the rock. When Lal was within a few feet of the officers

they shot him eight times and killed him. *Lal*, 746 F.3d at 1113-15.

The district court granted the officers' motion for summary judgment and the Ninth Circuit affirmed. On appeal, Plaintiffs argued that the officers should have retreated, or defused the situation before Lal started advancing on them—arguments that have also been made in the present case. *Id*. at 1117. But the Ninth Circuit disagreed, holding that "Lal's wish to commit suicide would have endangered the lives of others as well as his own." *Id*. In addition, "Lal forced the issue by advancing on the officers." *Id*. "The fact that Lal was intent on 'suicide by cop' did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct." *Id*. The Court also held that "when Lal advanced on the officers with a large rock held over his head, the officers sincerely and reasonably believed that Lal intended to seriously harm them if they did not shoot him." *Id*. Finally, the Court noted that "police officers 'need not avail themselves of the least intrusive means of responding' and need only act 'within that range of conduct we identify as reasonable." *Id*. at 1118.

The totality of the circumstances in the present case are similar. Faced with making a split-second decision as Rudhman advanced on them with a loaded handgun, refusing to obey commands to stop and/or drop the gun, and verbally manifesting his intent to disobey those commands, their decision to use deadly force was reasonable.

**C. Summary Judgment should be granted as to Count Two because there is no genuine issue of material fact regarding whether the deputies committed an intentional tort. Nor did Plaintiff plead an intentional tort.**

There is no federal cause of action for wrongful death. *Est. of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1159 (S.D. Cal. 2015). Therefore, wrongful death claims are

a matter of state law, over which federal district courts have supplemental jurisdiction. 28 U.S.C. § 1367; *Andrich v. Kostas*, No. CV-19-02212-PHX-DWL, 2020 WL 377093, at *5 (D. Ariz. Jan. 23, 2020). Only the personal representative of the estate, here Lisa Yearick, is the proper party to bring the wrongful death claim, on behalf of herself and Huber.

Wrongful death claims are typically brought under a theory of negligence. However, when the underlying claim is based on an alleged excessive use of force, Arizona law holds that a wrongful death plaintiff must prove that her damages were caused by an intentional act, such as assault or battery. "[W]e conclude that negligence and intent are mutually exclusive grounds for liability. *Ryan v. Napier*, 245 Ariz. 54, 60, 425 P.3d 230, 236 (2018) (holding that a wrongful death plaintiff could not rely on a theory of negligence based on an officer's intentional release of a police dog). "Negligent use of intentionally inflicted force is not a cognizable claim." *Id*.

Count Two of Plaintiffs' Third Amended Complaint (Doc. 31) is couched in terms of negligence only. "The Deputies had a duty to use only necessary and reasonable force" (Para. 39). "The Deputies breached their duties . . . ." (Para. 40). "The Deputies' breaches of their duties caused and/or contributed to cause Edward's wrongful death." (Para. 41). Plaintiffs have not amended their complaint to allege an intentional tort and the deadline to amend or supplement pleadings was September 18, 2020. (Doc. 38). Plaintiffs' Responses to Court-Issued Mandatory Initial Discovery Requests appear to describe the wrongful death claim in general terms of an intentional tort: "Plaintiff claims that Defendants violated Mr. Rudhman's Fourth Amendment rights, as codified by 42 U.S.C. §1983, and Arizona state law, as codified by A.R.S. § 12-611, *et seq.*, by intentionally using unreasonable deadly

force on Mr. Rudhman." However, Plaintiff does not declare the theory upon which her wrongful death claim is based; battery, assault, or something else. Nor does she articulate how the elements were allegedly satisfied in this case. Thus, the claim is insufficient to avoid dismissal. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Even if Plaintiff had properly pled an intentional tort, the defenses of justification under A.R.S. §13-409 and 13-413, which do not apply to negligence actions, apply to intentional tort claims like battery. *Ryan v. Napier*, 245 Ariz. 54, 64, 425 P.3d 230, 240 (2018). A.R.S. §13-404, 405, 406, 410, 412, and 420 would similarly apply. The shooting in this case was clearly justified by the undisputed facts.

In any event, since the underlying basis of the wrongful death claim is that the Defendants violated Rudhman's Fourth Amendment rights, if that claim is dismissed then the wrongful death claim must also be dismissed. *Cavanaugh v. Cty. of San Diego*, No. 3:18-CV-02557-BEN-LL, 2020 WL 6703592, at *42 (S.D. Cal. Nov. 12, 2020), *judgment entered*, No. 18-CV-02557-BEN-LL, 2020 WL 6702029 (S.D. Cal. Nov. 13, 2020), and *aff'd,* No. 20-56311, 2021 WL 6103115 (9th Cir. Dec. 22, 2021) ("even if a wrongful death claim were proper, where Plaintiffs have failed to show that Defendants violated Mr. Boulanger's constitutional rights, the claim would still fail.").

The wrongful death claim fails because Plaintiff has not articulated that it is based on an intentional tort, nor identified the intentional tort that forms the basis of the claim. It also fails because the underlying constitutional claim fails.

**D. Summary Judgment should be granted as to Count Three because there is no genuine issue of material fact regarding whether the deputies' conduct**

**shocks the conscience.**

Parents have a Fourteenth Amendment right to the companionship of a child. *Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1168–69 (9th Cir. 2013). Spouses and children may likewise assert Fourteenth Amendment substantive due process claims if official conduct deprives them of their liberty interest in the companionship and society of their spouse or parent. *Est. of Lopez ex rel. Lopez v. Torres,* 105 F. Supp. 3d 1148, 1160 (S.D. Cal. 2015). Such claims must be based on underlying governmental conduct that amounts to a constitutional violation, such as an allegation of excessive use of force under the Fourth Amendment. *Id*. If the Court finds that the underlying allegation is not demonstrated, then the Fourteenth Amendment substantive due process family relations claim must also fail. *Id*. (citing *Corales v. Bennett*, 567 F.3d 554, 569 n. 11 (9th Cir. 2009).

The standard for this claim is whether the actions of the officers "shocks the conscience." *Id.* at 1160. Under this standard, Courts look at which of two situations apply, (1) whether the officer(s) had time to deliberate or (2) whether the incident took place over a short time period that necessitated fast action. *Id*. at 1160-61. "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

Deliberate indifference that shocks the conscious is akin to situations where there are "extended opportunities to do better teamed with protracted failure even to care" and situations where "officers have ample time to correct their obvious mistaken detention of the wrong individual, but nonetheless fail to do so." *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (citing *Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) and *Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001).

When officers are forced to take fast action, on the other hand, the "purpose to harm" standard applies and requires Plaintiff to prove "that [the officer's] purpose was 'to cause harm unrelated to the legitimate object of arrest.' More specifically, '[i]t is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under §1983." *Porter,* 546 F.3d at 1140. (Internal citation omitted). Under this standard, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Lewis*, 523 U.S. at 853.

Because the present incident took place over a short period of time that necessitated fast action, analysis under the "purpose to harm" standard is appropriate. Because there is no evidence to even suggest that the Defendants here intended to cause harm unrelated to the legitimate object of arrest, summary judgment is warranted.

**IV. CONCLUSION**

Because there are no genuine issues of material fact regarding the three counts in Plaintiffs' Third Amended Complaint, and because the undisputed facts warrant the Court

entering judgment for the Defendants, summary judgment should be granted.

**RESPECTFULLY SUBMITTED** this 3rd day of February 2022.

ALLISTER ADEL
MARICOPA COUNTY ATTORNEY
BY: */s/ Charles Trullinger*
CHARLES E. TRULLINGER
SHERLE R. FLAGGMAN
Deputy County Attorneys
*Attorneys for Defendants Sheriff Penzone, Leatham, Kelleher, and Asiedu.*

CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Honorable Steven P. Logan
Judge of the United States District Court
**Sandra Day O'Connor U.S. Courthouse, Suite 521**
401 West Washington Street, SPC 82
Phoenix, Arizona 85003-2154

Larry Wulkan
**Zwillinger Wulkan, PLC**
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
larry.wulkan@zwfirm.com
*Attorney for Plaintiff Lisa Yearick*

J. Scott Halverson
**Law Office of J. Scott Halverson**
1095 West Rio Salado Parkway, Suite 206
Tempe, Arizona 85281
scott@halversonfirm.com
*Attorney for Leigha Huber*

s/*J. Christiansen*

S:\CIVIL\CIV\Matters\CJ\2019\Yearick vs MC CJ2019 0156\Pleadings\Word\MSJ\Defendants' MSJ Final.docx